# District of Columbia
# Court of Appeals

**Nos. 12-CF-1778, 12-CF-1799, 12-CF-1800, and 12-CF-1869**

MARCELLUS MCCRAY, LAMONTE HENSON,
ANTONIO FORTSON, AND TIMOTHY PARKER,
Appellants,

v.

UNITED STATES,
Appellee.



**CF1-4749-11; CF1-4744-11;
CF1-4729-11; CF2-12342-10**

On Appeal from the Superior Court of the District of Columbia
Criminal Division

BEFORE:  GLICKMAN and FISHER, *Associate Judges*; and REID, *Senior Judge*.

## J U D G M E N T

This case came to be heard on the transcript of record, the briefs filed, and was argued by counsel.  On consideration whereof, and as set forth in the opinion filed this date, it is now hereby

ORDERED and ADJUDGED that appellant Fortson's lesser-included convictions of assault with a dangerous weapon ("ADW") (counts 5 and 6) and voluntary manslaughter (count 10), as well as the related weapons charges, are affirmed.  Appellant Henson's conviction of carrying a pistol without a license ("CPWL") (count 16) is reversed.  In addition, appellants Parker's and McCray's cases are remanded to the trial court solely to provide these appellants with an opportunity to show at a hearing and through expert opinion whether at the time of his trial testimony, Mr. Faison's mental disabilities seriously impacted his credibility.  After the hearing, the trial court should enter an order consistent with this opinion's discussion of the mental disabilities issue.

For the Court:

JULIO A. CASTILLO
Clerk of the Court

Dated:  March 10, 2016.

Opinion by Senior Judge Inez Smith Reid.

*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

FILED 3/10/16
District of Columbia
Court of Appeals

Julio Castillo
Clerk of Court

# DISTRICT OF COLUMBIA COURT OF APPEALS

Nos. 12-CF-1778, 12-CF-1799, 12-CF-1800, and 12-CF-1869

MARCELLUS MCCRAY, LAMONTE HENSON, ANTONIO FORTSON, and TIMOTHY PARKER, APPELLANTS,

v.

UNITED STATES, APPELLEE.

Appeals from the Superior Court
of the District of Columbia
(CF1-4749-11, CF1-4744-11, CF1-4729-11, and CF2-12342-10)

(Hon. Henry F. Greene, Trial Judge)

(Argued June 9, 2015                          Decided March 10, 2016)

*Stephen Domenic Scavuzzo* for appellant McCray.

*Thomas T. Heslep* for appellant Henson.

*William R. Cowden* for appellant Fortson.

*Peter H. Meyers* for appellant Parker.

*David P. Saybolt*, Assistant United States Attorney, with whom *Ronald C. Machen Jr.*, United States Attorney at the time the brief was filed, and *Elizabeth Trosman*, *Elizabeth H. Danello*, *Jeff Pearlman*, and *Laura Bach*, Assistant United States Attorneys, were on the brief, for appellee.

Before GLICKMAN and FISHER, *Associate Judges*, and REID, *Senior Judge*.

REID, *Senior Judge*:   These appeals arise from the indictment of nine men on multiple felony charges relating to shootings, assaults, and murders that occurred in the Benning Terrace housing complex in the Southeast quadrant of the District of Columbia from 2009 to 2011.[1]   Appellants Marcellus McCray, Lamonte Henson, Antonio Fortson and Timothy Parker were tried together by a jury presided over by the Honorable Henry F. Greene.[2]   At the conclusion of the trial, which lasted about two months, they were convicted of some of the charges.[3]   They present numerous arguments on appeal:   (1) Mr. Fortson argues that the trial court abused its

---

[1]   The charges involving all or some of the nine men included conspiracy to assault and murder, in violation of D.C. Code § 22-1805 (a) (2012 Repl.); first-degree murder while armed (premeditated), in violation of §§ 22-2101 and -4502; second-degree murder while armed, in violation of §§ 22-2103 and -4502; assault with intent to kill while armed (AWIKWA), in violation of §§ 22-401 and -4502; possession of a firearm during a crime of violence or dangerous offense (PFCV), in violation of § 22-4504 (b); carrying a pistol without a license (CPWL), in violation of § 22-4504 (a); and unlawful possession of a firearm – prior felony (UPF), in violation of § 22-4503 (a).

[2]   Curtis (a/k/a Kurtis) Faison and Lamont Thomas were tried with appellants, but they entered guilty pleas during trial.   Three other men, Kevin Magruder, Deandre Mungo, and Anthony Hebron were tried separately.

[3]   The jury found Mr. McCray guilty of AWIKWA, the lesser-included offense of voluntary manslaughter, PFCV and CPWL; Mr. Henson guilty of CPWL; Mr. Fortson guilty of the lesser-included offense of voluntary manslaughter, the lesser-included offense of assault with a dangerous weapon (ADW), PFCV, and CPWL; and Mr. Parker guilty of the lesser-included offense of voluntary manslaughter, PFCV, CPWL, and UPF.

discretion by permitting a juror who violated the court's instructions to continue serving, thus denying Mr. Fortson his Sixth Amendment right to an impartial jury; (2) Messrs. McCray, Fortson, and Parker claim error pertaining to the trial court's urban gun battle and aiding and abetting instructions; (3) Messrs. McCray, Henson, and Fortson contend that the evidence was insufficient to convict them of specified charges; (4) Mr. McCray and Mr. Parker contend that the trial court abused its discretion by curtailing their efforts to obtain mental health information in order to impeach a key government witness and former codefendant; and (5) appellants make several other arguments, some of which we treat summarily.

For the reasons stated below, we (1) discern no abuse of discretion with respect to Judge Greene's approach to and resolution of the alleged juror misconduct issue; (2) conclude that (a) the trial court's urban gun battle and aiding and abetting instructions did not result in a constructive amendment of the indictment, and (b) there was no prejudice to the defendants resulting from these instructions, and hence, any error would be harmless; (3) hold that the evidence was sufficient to convict Mr. McCray of counts 8 and 9; (4) hold that the evidence was sufficient to convict Mr. Fortson, Mr. McCray, and Mr. Parker, as co-principals, of the lesser-included offense of voluntary manslaughter (count 10), as well as the related

weapons charges; (5) reverse Mr. Henson's CPWL conviction (count 16) on insufficiency of evidence grounds; (6) conclude that the government's evidence was sufficient to convict Mr. Fortson of ADW (counts 5 and 6); (7) hold that the government proved by a preponderance of the evidence that the statements in Mr. McCray's videotaped confession were voluntary; (8) conclude that the trial court did not abuse its discretion in denying Mr. McCray's severance motion; (9) reject Mr. Parker's contention that the trial court abused its discretion in permitting Ms. Rajah to testify on redirect that she relocated, in part, because of her fear of Mr. Parker, and we also reject Mr. Parker's merger arguments; (10) remand Mr. Parker's and Mr. McCray's cases to the trial court solely to provide them with an opportunity to show, at a hearing and through expert opinion, whether at the time of his trial testimony Mr. Faison's mental disabilities seriously impacted his credibility; and (11) conclude that appellants' other contentions are not persuasive.

# FACTUAL SUMMARY

The government presented evidence of shootings[4] in April and May 2010, and other months, in part of the Benning Terrace housing complex.[5]   The shootings took place in two areas:   (1) an area known as "the circle" where several low-rise apartment buildings are located to the north of and on the west and east sides of 46th Place, and (2) an area known as "the Avenue" because it is located near Alabama Avenue where other housing units are located.

---

[4]   Since the jury acquitted all of the appellants on the conspiracy to murder charge and could not reach a verdict on the conspiracy to assault charge, we do not set forth detailed evidence presented by the government concerning the alleged conspiracy.

[5]   The housing complex consists of apartment buildings, row houses, and common areas.  The boundaries of part of the Benning Terrace housing complex include 46th Street which curves around part of the complex; F Street towards the northern part of the complex; G Street towards the southern part of the complex; and 46th Place which is perpendicular to G Street and which ends in a circle in the northern part of the complex.   Alabama Avenue is partly parallel to 46th Street and crosses both F Street and G Street.   In front of the circle, which has space for parked cars, are interconnected low-rise apartment buildings – 600, 602, and 604 46th Place.   Forty-Sixth Place also separates interconnected buildings – 601, 603 and 605, located on one side of 46th Place, and interconnected buildings – 610, 612 and 620, situated on the other side of 46th Place.   There is also space for parking outside of one end of building 605, and there are mailboxes in the courtyard at the other end of building 605.   Garbage dumpsters are located on the other side of building 605.

The shootings arose from a "beef" or feud between young men who identified with "the circle" and others who were linked to "the Avenue." The feud grew out of drug transactions in the circle area of the housing complex. Jovan Clay, who at one time lived in the 620 building on 46th Place, testified that the feud occurred because young men from the Avenue were "trying to come in the circle and rob people in the circle."[6] Joshua Johnson, who lived on F Street, near Alabama Avenue, but who hung around the circle, stated that "there was a dispute between individuals who hung over on the Avenue and individuals who hung in the circle." The feud between the young men from the circle and those from the Avenue involved the use of guns. As Mr. Clay put it, the circle and Avenue men were

---

[6] Several of the government's witnesses were given immunity, executed cooperation agreements with the government, entered guilty pleas to felonies, served time for past convictions, or were incarcerated for trying to flee before the trial in this matter. Jovan Clay had a plea agreement, and entered guilty pleas to second-degree murder while armed of Michael Wilson, assault with intent to rob Mekal Jones, and conspiracy to distribute narcotics and possess firearms in the circle. Angelo Wages was given limited immunity and was incarcerated at the time of his testimony because he had attempted to flee after receiving a subpoena to appear as a witness in this case. At the time of his testimony, Joshua Johnson was incarcerated for a probation or parole violation; had served time for armed carjacking, and had entered a guilty plea to a felon in possession of a firearm offense but had not yet been sentenced; he signed a cooperation agreement with the government. Curtis Faison signed a cooperation agreement with the government; entered a guilty plea to a charge of second-degree murder while armed of Melvin White; conspiracy, obstruction of justice, and assault (of a correctional officer); and he had been convicted previously of various crimes, including second-degree burglary.

"trying to kill each other." According to Mr. Johnson, Mr. Fortson once said "bi**h a*s nig**s from the Avenue, they always . . . think they're going to come out here and do what they want and we[']re not going to do nothing to them." Mr. Johnson also heard Mr. McCray say, "he kill[ed] when he was over there [the Avenue], some bi**h a*s nig**s."

The first shooting that was the subject of the case against appellants concerned Melvin White who was shot and killed on April 10, 2010. After the government presented compelling evidence that Curtis Faison shot and fatally wounded Mr. White, Mr. Faison entered a guilty plea to various charges, including the murder of Mr. White.

The second and third shootings pertaining to the case against appellants took place on May 30, 2010. Linwood Hopkins, who lived on the third floor in the 610 building on 46th Place with his wife and their children, testified that on May 30 he and his family returned from a cookout around 7 p.m. That night he heard shots coming from the back of his building towards Alabama Avenue. He looked out of a window and saw someone running towards some dumpsters. He went to his balcony at the front of his apartment to alert people who were having a cookout to go

inside. He heard more shots and saw a man run from the side of his building while shooting; the man ran behind building 600. Mr. Hopkins also witnessed a man dropping in front of his building, and he heard "a lot of shooting"; it sounded as though two or three guns were being fired.

Although he could not remember the exact date on which he saw and heard shootings at the Benning Terrace complex, Carl Brown, a maintenance worker for the District of Columbia Housing Authority, testified that it was a "warm day" in 2010. While he was working on a house at 46th Place and G Street, he heard shots and saw Lamont Thomas (who entered a guilty plea during trial), Mr. Fortson, and about four other men. Mr. Brown got under a truck. Mr. Thomas started shooting; he had "something like" "a 357." Young men walking up G Street were shooting back. Mr. Fortson had a small handgun in his hand but Mr. Brown did not see Mr. Fortson fire the gun. Mr. Fortson went behind a building on the right side of 46th Place, and Mr. Brown heard "a whole lot of shooting . . . back and forth." Mr. Brown testified before the grand jury that following the shooting, Mr. Fortson said to him, "[my] bad." At trial, Mr. Brown said Mr. Fortson declared, "[my] bag."

One of the government's main witnesses regarding the events of May 30, 2010, was Angelo Wages. He grew up in Benning Terrace and lived in the 4600 block of G Street with his mother and sisters. At the time of the May shootings he had lived alone in a first floor apartment in building 620 on 46th Place for about three years. He was a reluctant trial witness and the prosecutor often used his grand jury transcripts of September 10, 2010, and September 24, 2010, to refresh his recollection or to impeach him about details relating to the events of May 30 and the actions of the appellants.

Mr. Wages recognized all of the appellants at trial. He admitted having a conversation with Mr. Fortson about keeping guns at his (Mr. Wages's) apartment. He had seen Mr. Parker around Benning Terrace with Mr. Buckner, a young man who lived in the circle part of Benning Terrace and who was killed late on the night of May 30. That night, Mr. Wages observed several young men with guns, including Mr. Henson, Mr. Thomas, Mr. Mungo, and Mr. Magruder. Earlier on May 30, before Mr. Buckner was shot, Mr. Wages heard gunshots and went outside. Mr. Thomas, Mr. Magruder and someone else were engaged in conversation. Mr. Thomas said, "They're shooting at the Avenue." The day after the May 30th shootings, Mr. Wages spoke with Mr. McCray who said that before the later

shootings on May 30, he had been "shooting at the Avenue boys." The shooting was coming from the "back cut" near building 620. Mr. McCray said he was shooting with Mr. Mungo and Mr. Mungo indicated that he was shooting at the Avenue.

Following the first shootings on May 30, Mr. Wages later sat with Mr. Buckner and another person at the mailboxes, located near buildings 601, 603 and 605. Mr. Wages heard shots and got up to go into building 601. Mr. Buckner was behind him, carrying a chair and a wine bottle. Mr. Buckner never made it inside building 601. Mr. Wages saw Mr. Buckner get shot and fall to the ground. Mr. Buckner got up and staggered; he was "leaning forward, like he couldn't quite stand up straight." Mr. Wages watched Mr. Buckner from a window on the second floor of building 601 where he could see the mailboxes and half of the circle. Mr. Henson and Mr. Fortson were shooting in the courtyard between buildings 601, 603 and 605. They also had shot in a grassy area between buildings 600 and 601, near a playground. Mr. Henson and Mr. Fortson were "shooting across the circle to the cut between [buildings] 604 and 610." They fired "over eight" shots in the grassy area between buildings 600 and 601, and "four shots" into the grassy area between buildings 604 and 610. At trial, Mr. Wages denied being able to see Mr. Henson's

and Mr. Fortson's faces, but he was impeached with his grand jury testimony stating that when he looked out of the window he saw their faces. On the night of May 30, Mr. Wages had a conversation with Mr. Henson and Mr. Fortson about what had happened. Mr. Henson said "he was putting in work," and Mr. Fortson "said he was putting in work, meaning shooting back."

Mr. Clay was another government witness. He described his relationship with Mr. Henson as that of a brother. The two men lived together in 2008 and 2009. Between July 4, 2009, and the time of his [Mr. Clay's] arrest in 2010, including April and May 2010, Mr. Clay "always" saw Mr. Henson with guns, "different type[s] of guns." These included Glock .40 caliber and .45 caliber "handguns" with barrels between 9 and 10 inches in size, as well as guns with bigger barrels of 9 to 11 inches. He never saw Mr. Henson with "a big rifle or shotgun."

Mr. Clay witnessed shootings on May 30, 2010. Early in the morning and before the murder of Mr. Buckner, Mr. Clay and Mr. Fortson were outside. A man named Junior walked through a cut below building 620. Mr. Fortson "was coming through the cut by the mailbox" near building 605 and Mr. Fortson "started shooting at [Junior] [a]nd he ran back on the [A]venue." Later, Mr. Clay walked around the

circle and stood, with another man, by the mailboxes near the courtyard of building 605. He saw Mr. Buckner sitting in a little chair by the mailboxes; Mr. Fortson was by the mailboxes. Mr. Clay heard shots "coming from off the Avenue." Before hearing additional shots he saw Mr. McCray, Mr. Hebron and Mr. Mungo walk by the mailboxes towards the parking lot where dumpsters were located. A resident, Shunedia ("Nita") Rajah, stepped out on her balcony. She told everyone to run because people were about to start shooting. Mr. Clay saw three men; shots were fired towards the back hill. He ran to the second floor of building 605 and looked out of the window. A person from the Avenue came out of a cut shooting towards the parking lot by building 605. Mr. Hebron shot back. Mr. Mungo and Mr. McCray stood in the middle of the parking lot near dumpsters, taking turns shooting back with a Glock that had a 30-shot clip in it.[7] Mr. Mungo proceeded down the sidewalk towards G Street while Mr. McCray continued to shoot before following Mr. Mungo. Mr. Fortson went into one of the buildings; he had his Glock .40, gave it to Kevin Johnson and asked him to "put this up." After the shooting stopped, Mr. Clay exited building 605 and noticed Mr. Buckner on the ground. Later that night, Mr. Clay had conversations with Mr. Hebron and Mr. McCray and they both

---

[7] Around the time of Mr. Buckner's murder, Mr. Johnson saw Mr. McCray with a gun before and after Mr. Buckner was shot.

commented on the earlier shootings saying, "Man they always come down here. Why we can't go up there first?"

Toni Hopkins, the wife of Linwood Hopkins, and Ms. Rajah testified on behalf of the government. Ms. Hopkins was in her bedroom towards the front of her apartment on May 30. Ms. Rajah, who lived in the apartment below the Hopkins' apartment, was with Ms. Hopkins when they heard gunshots which appeared to come from the back, near a field. Ms. Rajah went out onto the balcony and later Ms. Hopkins took her a phone so she could call 911. Ms. Rajah asked Ms. Hopkins, "Did you hear my door slam," and Ms. Hopkins asked, "You didn't lock your door?" The next day Ms. Hopkins was in Ms. Rajah's apartment when a man known as "Son" (Mr. Magruder) came in and asked Ms. Rajah if anyone gave her anything. Mr. Magruder told Ms. Hopkins to get up from the couch; he retrieved a gun from underneath a cushion. Ms. Rajah "flicked off" and Son "told her to shush" and left the apartment.

Ms. Rajah used to live on the second floor of building 610. When she came home on the evening of May 30, 2010, a lot of people were outside having a cookout. She went up to visit the Hopkins. During her visit, Mr. Hopkins called

her to the balcony. She saw Mr. Parker, Mr. Henson, Mr. Clay, kids and neighbors. She observed Mr. Parker move from the mailboxes near building 605, cross the street and walk towards building 610. He had a rag over the top of his hand, and was making the kids and neighbors go inside the building. Ms. Rajah saw and heard Mr. Parker shoot a gun once at a man coming up the hill and going around the building. Later, he aimed the gun towards a fence. Mr. Parker was shooting – "pow, pow" – and then gunshots rang out from the hill between buildings 604 and 610, by the playground between buildings 600 and 601, and the area around building 620. She claimed she saw William Spriggs ("Wheetie") fire the fatal shot that killed Mr. Buckner. The day after the shootings, Ms. Hopkins was in Ms. Rajah's apartment when Mr. Magruder came and asked whether Mr. Parker had left anything in her apartment. She replied, no, but also indicated that her door was unlocked and she had been upstairs. Mr. Magruder removed a gun from under a couch pillow and a bullet. Ms. Rajah had not seen the gun before; it was a semi-automatic weapon.[8]

---

[8] During June 2010, Ms. Rajah looked out of her kitchen window and saw Mr. Henson in the grassy area behind her building. He was shooting into an area by houses off G Street. However, she could not see the type of gun that Mr. Henson held. She went to her living room and saw him jump over the balcony into Mr. Wages's house. When he came out of the building, he had on a different shirt. She also saw Mr. Mungo and Mr. McCray running from the playground by buildings 600 and 601 towards her building. She heard gunshots and saw Mr. Mungo tucking something in his pants that looked like a gun.

In June 2010, Ms. Rajah looked out of her kitchen window and saw Mr. Henson shooting a gun towards houses off of G Street, but she could not see the kind of gun that he possessed. On cross-examination, Ms. Rajah acknowledged that she received a voucher for housing paid for by the government after she relocated to a different address. On redirect examination, she testified that she left the Benning Terrace complex because she "was scared" and afraid of Mr. Spriggs, Mr. Parker, and Mr. Magruder.

During his testimony after he entered guilty pleas to certain charges, Mr. Faison implicated both Mr. Parker and Mr. McCray. On the night that Mr. Buckner was killed, Mr. Parker told Mr. Faison that he was in the area of the mailboxes chilling, and that he grabbed a gun hidden underneath the steps at the 605 building. Mr. Parker said he "crossed the circle and had his hand and the gun covered with a scarf of some sort." Mr. Parker "started pushing people into the building" "when he saw William Spriggs or Wheetie come out the back hill." Mr. Parker "shot once but the gun jammed." He went inside the building, fixed the jam "[a]nd then he came back out shooting." During a conversation with Mr. Parker in March 2011, for which Mr. Fortson, Mr. Henson, Mr. Thomas and Mr. McCray were present, Mr. Parker and others sent Mr. Hebron over to the Avenue and "they did a bulls**t job."

Mr. Fortson said he was involved in sending Mr. Hebron "and them" over to the Avenue to shoot prior to the shootout that ended with Mr. Buckner's fatal shooting, and that he was over by the mailboxes and shot at someone by the playground and back towards the hill. Mr. McCray asserted that prior to the shootout, he went over to the Avenue and shot with Mr. Hebron and Mr. Mungo.[9]

---

[9] Defense counsel conducted rigorous cross-examination of Mr. Faison, seeking to cast doubt on his character and truthfulness, and attempting to show that he was courting favor with the government. In response to cross-examination by Mr. Parker's counsel, Mr. Faison admitted that he killed Melvin White, would have killed Mr. Wages had he (Mr. Faison) been kicked out of Mr. Wages's home, had pulled a gun on many people, tried to prevent government witnesses from coming to court to testify at his trial, obstructed justice, was testifying because he wanted leniency from the government, the government dropped an ADW charge against him for throwing a chair at a correctional officer, had been locked up since age 10 for stealing cars and robbing people, and had stabbed someone in the head three or four times while he was incarcerated at the D.C. Jail. Counsel for Mr. Fortson and counsel for Mr. McCray both asked about Mr. Faison's request for their assistance at trial, which he denied. Specifically, Mr. Faison denied asking counsel for Mr. Fortson whether there were any holes in the government's conspiracy case, being told that the government had failed to put all of the defendants together, and then seeking to put them together during his testimony. Counsel for Mr. Fortson also established that Mr. Faison had pled guilty to second-degree murder but not to the PFCV charge. In response to a question from Mr. McCray's lawyer, Mr. Faison denied knowing an inmate at the D.C. Jail named Robert Golden. However, he admitted to the prosecutor on redirect examination that he not only received a letter at the jail from Mr. Golden, but also that Mr. Golden had watched him (Mr. Faison) grow up.

In addition to testimony from fact witnesses about the events in Benning Terrace in May and June 2010, the government presented ballistics evidence, and the testimony of Dr. Marie-Lydie Pierre-Louis, the District's Chief Medical Examiner at the time of Mr. Buckner's murder. Metropolitan Police Department ("MPD") officers and technicians collected shell casings from the scene and an independent firearms technician linked the casings to weapons fired by appellants during the shootings on May 30, 2010.[10] Dr. Pierre-Louis performed the autopsy of Mr. Buckner and stated that the cause of death was a gunshot to the head and neck. She "recovered a copper-jacketed bullet" and two small fragments from Mr.

---

[10] MPD mobile crime technician, Petheria McIver, responded to the 600 block of 46th Place around 10:30 or 11:00 p.m. on May 30, 2010. She located shell casings, a whole bullet and a bullet fragment by building 610. MPD Officer Edward Roach, a crime scene investigator, collected shell casings in an area across from buildings 610, 612 and 620. John Holder, MPD evidence technician, re-canvassed the area early on the morning of May 31, 2010, and recovered cartridge casings in the parking lot near dumpsters and near the mailboxes. Robert Freese, an independent firearm examiner, analyzed the ballistics evidence in an effort to identify the guns that fired the bullets and cartridge casings. He determined, in part, that the shell casings recovered from the scene were fired from a .380 semiautomatic pistol, a .40 caliber semiautomatic firearm, a Glock 9-millimeter Lugar Model 19 pistol, and a Talon 9-millimeter semiautomatic pistol. The evidence was not clear as to the weapon that fired the bullet removed from Mr. Buckner's body. In addition, the government introduced and the trial court admitted Exhibit 582 showing the location of color-coded shell casings recovered from around the front of building 610 that were fired by the same .40 caliber firearm, casings from the area of the mailboxes fired by the same 9-millimeter weapon, and casings around building 605 fired by the same (but two different) 9-millimeter weapons. Exhibit 582 also reflected the recovery of .380 shells found on the Avenue.

Buckner's body. The independent firearm examiner testified that the .38 class copper-jacketed bullet removed from Mr. Buckner was "not consistent" with any of the four firearms (two 9-millimeter Glock 19 pistols, a .40 CZ semiautomatic pistol, and a Talon 9-millimeter pistol) introduced by the government. A .38 class would include a 9-millimeter, a .38 special and a .357 magnum firearm.

## ANALYSIS

### Alleged Juror Misconduct

Mr. Fortson contends that the trial court abused its discretion by permitting a juror who violated the court's instructions to continue serving without proper investigation as to "whether that juror really had pre-decided the case at the outset of the trial, and possibly spoken about her decision with even more jurors," thus denying his Sixth Amendment right to an impartial jury.

### *The Factual Context*

We first set forth the factual context for this issue. Before the jurors retired to begin deliberations on the afternoon of Tuesday, July 3, 2012, Judge Greene cautioned them that, "It is unwise for any juror on entering the jury room to voice an emphatic expression of his or her opinion on these cases or to announce a determination to stand only for a certain verdict as to a particular count or a particular defendant." He further instructed the jurors, "To each of you I would say that you must decide these cases for yourself, but you should do so only after discussing them with your fellow jurors and you should not hesitate to change your opinion if you become convinced that it's in error."

Judge Greene received four notes on Thursday, July 12, 2012, all from the foreperson – the first at 11:57 a.m., the second at 1:29 p.m. and the last two at 3:15 p.m. The first note concerned the conspiracy counts, which are not at issue in this appeal; the second note said, "We would like to see gun #6," and that note was a follow-up to the jury's July 5 request to see all of the guns.[11] The third note stated,

---

[11] Judge Greene instructed the jury about the conspiracy question and the request to see all of the guns around 12:30 p.m. The court initially believed that

(continued…)

"I would like to have a private conversation with Judge Greene about an important matter concerning a specific juror who has had their mind made up on the first week." The fourth note read, "If we are deadlocked on one count, would that negate all the rest of the charges and how long does it have to take to deliberate if we still can't come to a conclusion."

Counsel and Judge Greene initially disagreed about when and how to respond to the jury about the third and fourth notes. The judge proposed that given the 4:00 p.m. hour, he simply tell the jury that he was not prepared to respond at that time and excuse the jury for the weekend. The prosecutor disagreed, noting that the jury had been deliberating only for "maybe four and a half hours a day," and that "[t]here's clearly a problem." She opposed a three-day delay without obtaining some "clarification about the note with a specific juror who has their mind made up." If the juror both had his or her mind made up and was refusing to deliberate, the prosecutor argued "that that would require us to take additional steps" and an

_____

(…continued)

only four guns had been admitted into evidence. After discovering that five had been admitted, five were shown to the jury. But a sixth gun had been admitted and the court asked the jury to inform it if it needed to see the sixth gun. The jury later requested gun #6, and that gun also was shown to the jury.

alternate might have to be designated to deliberate. One defense counsel agreed with Judge Greene's proposal.

Judge Greene declined to follow the government's suggestion, saying "the worst thing one can do here is act precipitously, and it may be the worst thing one can do is to get clarification," "or to isolate a juror early on in this process." He observed that cases in which the verdict was sustained "tend to be [those] where judges acted cautiously and did everything they could to avoid isolating jurors and avoid anything that would look like coercing them." He also referenced the significance of the fourth note concerning a deadlock. After further argument from the prosecutor and following views of other defense counsel in favor of Judge Greene's proposal, the judge decided to follow his proposal. He explained to the jury that he needed to discuss the notes with counsel. The judge also informed the jurors that he appreciated their service, and he conveyed his understanding that the process was not "easy" and that is why jurors are "encouraged . . . to express [their] own views . . . [and] to try to deal with each other in a civil and courteous and respectful fashion." He complimented the jurors for doing that, and dismissed them until Monday morning.

After dismissing the jury, Judge Greene informed counsel about his preliminary thoughts on the notes, as well as case law that he considered helpful. On Monday morning, he pondered whether the third note meant that the juror had his or her mind made up since the first week of trial or the first week of deliberations. Following discussion with counsel, he brought the foreperson in for the purpose of answering that question. Judge Greene first informed the foreperson that he could never have a private conversation with any juror, and then posed the question, to which the foreperson responded, "first week of trial." The judge sent the foreperson back to the deliberation room with instructions not to discuss the matter with the other jurors.

Judge Greene informed counsel that he wanted to find out what is meant by "had her mind made up." However, he regarded the foreperson as "somebody [who] could talk expansively," and thus, the judge wanted to pose "very specific questions" to her. Counsel for Mr. Fortson advocated identifying the juror whose mind had been made up and then conducting a *voir dire* of that juror. He also thought that in order to determine "taint," the court should conduct a *voir dire* of the entire jury panel to determine whether the other jurors "agree[d] with the foreperson's assessment that this juror is not deliberating." Judge Greene and

Counsel for Mr. Fortson continued to exchange views about how to proceed. The judge agreed with Counsel that they needed to determine whether the foreperson's statement was "based on a hunch," although he suspected that it was not. But Judge Greene again expressed concern that the foreperson was "a fairly voluble foreperson," and hence, he "want[ed] to be very careful about what additional things he asked her."[12]

Following a caucus of defense counsel, there were further discussions between counsel and the court. Counsel for Mr. Fortson particularly wanted to know whether other jurors were present when the juror in question spoke with the foreperson about his or her mind being made up. Judge Greene made it clear that he would not ask the foreperson to identify the juror. He summarized the types of questions he might ask the foreperson, and the prosecutor thought they were "way too much." After further reflection, Judge Greene remarked that "everybody agrees that we ought to find out . . . whether this was a one-time remark or whether it has

---

[12] Judge Greene also considered the views of the prosecutor, and he shared with counsel his discussion with a colleague whom he respects. Judge Greene and the colleague both agreed that they should avoid "singling out a juror, because when you start singling out a jur[or] you move quickly into the territory of where there is some alleged coercion."

been repeated, and whether [the foreperson] has only discussed it with the juror or with all of the jurors." Counsel for Mr. Fortson concurred, and added, "In terms of identifying the particular juror, obviously as the court said, that would be a final step in the process. And I am not, if the [c]ourt believes that taking this process incrementally we need to go there, and that is fine."

Judge Greene summoned the foreperson, instructed her to respond only to the questions posed, and after a preliminary question asked when the foreperson learned that "the juror had their mind made up." From the options provided by the judge, the foreperson said, "During the trial." With additional questioning Judge Greene learned that the foreperson spoke with the juror "[a]round the first week of the trial," and the juror spoke only to the foreperson and not in the presence of all the jurors. The juror spoke with the foreperson "[o]nly one time."

While the foreperson waited in the back of the courtroom, Judge Greene conversed with counsel about whether additional inquiry should be made. Those participating in the conversation as to whether, and if so what, additional questions should be posed to the foreperson were counsel for Mr. Henson and Parker, and the prosecutor. After narrowing the follow-up questions to one, Judge Greene decided

to accept the prosecutor's suggestion that instead of asking the foreperson whether she spoke with any other jurors, he instruct the foreperson not to discuss the matter with other jurors. Counsel for Mr. Henson, the only defense counsel to speak on this approach stated, "That will probably be good, because it will nip it in the bud." Judge Greene brought the foreperson forward and gave instructions not to discuss the matter with other jurors, and told the foreperson that the court would speak with the jury panel. Neither counsel for Mr. Fortson, nor any other defense counsel, raised an objection.

When the jurors assembled, Judge Greene gave a lengthy charge, stating in part:

> One question raised the issue whether if the jury finds itself unable to reach a decision on one count does that mean the jury cannot continue to deliberate and reach verdicts on other counts. The short answer to that question is no.
>
> In other words, if the jury finds itself unable to reach a verdict as to one defendant on one count, the jury still may proceed to consider any remaining defendants charged under that count, if they are charged, and reach an individual verdict of guilty or not guilty as to each of those defendants.
>
> Likewise, similarly, if the jury finds itself unable to reach a verdict as to all of the defendants charged under a

particular count the jury may proceed to consider all of the other counts in which defendants are charged, and reach individual verdicts of guilty or not guilty as to each defendant on each remaining count with which that defendant is charged . . . .

[A] second question asked was how long the jury must deliberate if it cannot reach verdicts as to every defendant on every count, with which that defendant is charged. In response to that question, let me say as I think I may have told you earlier, there is no prescribed time for deliberations in any case. And, I am inclined to give the jury as much time as it needs to reach verdicts.

It is not my intention to force or coerce the jury to reach a verdict, but on this topic I think I should note that this has been a very long trial, close to two months. And longer than almost any other trials we have in Superior Court in the course of an average year.

I don't know exact numbers here, but I believe the jury has heard over 60 witnesses, it has had in excess of 500 exhibits to consider during its deliberations. And, as I reviewed the verdict form, before preparing these remarks, I counted at least 27 verdicts that you must consider when you add up all the verdicts requested on the verdict forms for all of the four defendants . . . . Thus, I would expect it to take a considerable amount of time to reach a resolution of the matters before you.

My best judgment is that up to this point I think you have been deliberating about five and a half days when you add . . . all the time together, which is certainly not an unusual length of time in cases of this length and complexity.

So, in sum, in response to the second question, I am going to ask that you deliberate further in these cases, and give them your best efforts, as I am sure you have been doing.

Now, before I let you return to the jury room though, I have to address the third question I received indicating concern about what happens if jurors make up their minds about issues in the case, either before all of the evidence, and testimony is in, or before jurors have heard the views of all their colleagues on the jury, and thus may not have been fully involved in the deliberation process up until now.

As I told you, in my preliminary instruction two months ago, . . . it is important during trial that each of you keep an open mind during the entire trial, and that each of you not decide any issue in this case until the entire case is submitted to you with my final instructions.

As I told you in my final instructions it is unwise for any juror at the outset of deliberations to voice an emphatic expression of his or her opinion on these cases, or to announce a decision or a determination to stand only for a certain verdict as to a particular count or a particular defendant until you have listened to and discussed the views of all of your colleagues on the jury.

As you left last Thursday, I talked to you a little bit about how difficult your job is. I know that jury deliberations involve serious issues, and serious views expressed by all members of the jury. The views each of you express are to be taken seriously and considered seriously. That is why I encourage each of you to express your views, and listen to each other's views and to always speak and listen in a courteous, thoughtful manner with respect for civility towards one another.

Bear in mind, that even during deliberations there is no verdict on an issue you are deliberating about until all 12 jurors agree, and each of you are free to change your mind at any time from a position you previously had to a new

position if you wish to and you think, you are convinced the new position is the correct one.

With these thoughts in mind, ladies and gentlemen, I am going to ask you to resume your deliberations . . . .

Now, if any of you feel for any reason that you have not been able to, or are not able to follow the instructions I have given you, please let me know in a written note, but do not discuss any personal concerns you may have in this regard with any of the other jurors. You can send me a note in writing if you have a concern about whether you can follow the instructions I have given you.

No counsel posed any objection to Judge Greene's statements and instructions.

### *The Parties' Arguments*

Mr. Fortson maintains that the trial court failed to conduct a proper investigation into "the circumstances of the offending juror's misconduct, and whether it may have contributed to others' violations of the court's instructions." He claims that the court abused its discretion by simply requiring jurors to let him know if they "were unable to follow the court's instructions." The government argues that Mr. Fortson's claim is subject to plain error review because he [and Mr. McCray] failed to object to the court's proposed procedure after the second *voir dire*

of the jury foreperson. [13] The government contends that, "In exercising its discretion, the trial court hewed closely to this [c]ourt's teaching about how to handle cases involving a complaint about deadlock and a juror not following the law." As a result, the government asserts, the trial court did not "err[] in deciding not to voir dire the jury individually," and Mr. Fortson's substantial rights were not prejudiced.

### *Applicable Legal Standard and Principles*

We are guided by the following legal standard and principles in analyzing the juror misconduct issue and the parties' arguments. "The authority to excuse a juror during deliberations is to be exercised with caution." *Brown v. United States*, 818 A.2d 179, 184-85 (D.C. 2003) (internal quotation marks and citation omitted). "Although the presence of a juror incapable of or unwilling to deliberate and decide a case on the evidence undermines the fairness of a trial, excluding a juror at this particularly sensitive stage of the trial, presents distinct risks both to the defendant's

---

[13] The government cites *Grant v. United States*, 85 A.3d 90, 99 (D.C. 2014), for the proposition that plain error applies because no objection was made after the court's instruction. We think it unnecessary to resolve the government's argument as to plain error, given our disposition concerning the trial court's handling of the alleged juror misconduct issue.

right to jury unanimity in criminal cases and to the secrecy of jury deliberations —
the cornerstone of the modern Anglo-American jury system." *Id*. at 185 (internal
quotation marks and citations omitted). Thus, although the trial judge has the
"authority to inquire into claims of juror misconduct during deliberations, . . . []he
must proceed . . . with caution, tact, and respect for the prerogatives of the jury." *Id*.
(quoting *Shotikare v. United States*, 779 A.2d 335, 345 (D.C. 2001) (internal
quotation marks omitted)).

### *Discussion*

Between Tuesday, July 3 and the morning of Thursday, July 12, Judge Greene
received only one note from the jury; on July 5, the jury asked to see all of the guns
introduced into evidence. Then came four notes in the late morning and afternoon
of July 12, two of which prompted Judge Greene to proceed cautiously – one about
the juror whose mind allegedly was "made up on the first week," and the other about
the jury's reported deadlock on one count (out of about 27 verdicts that had to be
rendered). Judge Greene elected to proceed cautiously, not only to avoid isolating
the juror in question, but also to protect the secrecy of the jury deliberations and the
right of the accused to a fair trial, as our case law dictates. *See Brown*, *supra*, 818

A.2d at 184-85; *Shotikare*, *supra*, 779 A.2d at 345. Judge Greene recognized the need for more information about the juror whose mind allegedly had been made up, but he also gleaned that the foreperson had a tendency to "talk expansively" and that she was a "fairly voluble foreperson." Consequently, the judge decided to proceed "incrementally," as Counsel for Mr. Fortson described Judge Greene's planned procedure, and to pose limited questions to the foreperson.

The question we confront is whether Judge Greene proceeded too cautiously and whether he at least should have made inquiry of the juror whose mind allegedly had been made up. Our task is not to second-guess Judge Greene on the cold record but to determine whether he abused his discretion, *see Johnson v. United States*, 398 A.2d 354 (D.C. 1979), by not conducting a more extensive investigation. Judge Greene obviously painstakingly discussed and weighed the views and suggestions of defense counsel and the prosecutor, even allowing defense counsel time to caucus. These views and suggestions ranged from seeking clarification from the foreperson, speaking with the juror whose mind was made up, considering replacing that juror, and making inquiry of all the jurors as to whether the juror in question had spoken with them.

At the end of the discussion and weighing process, Judge Greene decided to pose limited questions to the foreperson and to instruct the foreperson not to discuss the matter with other jurors, and further, he chose not to interview the juror in question. We see no abuse of discretion regarding Judge Greene's approach, given the factual context for the judge's decision, especially the context that (1) the conversation between the foreperson and the juror in question occurred during the first week of a relatively long trial; (2) no other juror was present during that conversation; (3) the jury apparently was deadlocked only as to one count when the July 12 notes were sent; and (4) Judge Greene gave a thorough and balanced statement to the jury on July 16 (a) acknowledging the difficult task facing the jurors, (b) expressing the need for civility, and (c) inviting any juror who could not follow the court's instructions to send him a note in writing. His decision certainly avoided isolating the juror in question and protected the integrity of the jury process. Moreover, his invitation to jurors who could not follow his instructions reflected the "usual presumption . . . that jurors understand and follow the judge's instructions." *Hankins*, *supra*, 3 A.3d at 363 n.23 (internal quotation marks and citation omitted). In short, we discern no abuse of discretion with respect to Judge Greene's approach to and resolution of the alleged juror misconduct issue.

**The Urban Gun Battle and the Aiding and Abetting Instruction**

Mr. McCray, Fortson, and Parker contend that the trial court committed error in giving the jury urban gun battle and aiding and abetting instructions; those instructions pertained to count 10 of the indictment (second-degree murder and the lesser-included offense of voluntary manslaughter).[14]  Before turning to the legal standard and principles governing the trial court's jury instructions, we summarize

---

[14]  Mr. Parker argues that the court's instructions "constituted an improper constructive amendment of the indictment," and "unlawfully lowered the government's burden of proof for aiding and abetting a homicide that occurs during an urban gun battle."  Mr. Fortson incorporates Mr. Parker's arguments.  He also maintains that the trial court gave an "inconsistent combination of instructions," because:  (1) "[u]rban gun battle liability may arise where the princip[a]l[] shooter is unknown, but aiding and abetting theory assumes existence of a principal shooter because, among other things, under aiding and abetting theory, *knowing association with the principal is required*" (citing case law); and (2) "[a]fter telling the jury that Mr. Fortson did not need to have fired the fatal shot to be guilty, as long as he actively participated in the gun battle . . ., the trial court told the jury that under an aiding and abetting theory Mr. Fortson could actually be guilty of Mr. [Buckner's] death regardless of whether he did any shooting and even if he was not present – *i.e.*, not part of the gun battle at all!"  Mr. McCray also asserts that the combination of urban gun battle and aiding and abetting instructions resulted in a constructive amendment of the indictment.  He argues that, "Aiding and abetting should not be given along with an urban gun battle instruction because an urban gun battle is a special case of aiding and abetting," and because "the aiding and abetting instruction mitigates the requirement that [a]ppellant's actions were a substantial factor in Antw[a]n Buckner's death and that it was reasonably foreseeable that death or serious bodily injury would result to an innocent bystander as a result of [a]ppellant's actions."

key parts of the instructions and discussions between the court, defense counsel, and prosecutor.

### *Factual Context*

Before closing arguments, the trial court instructed the jury. The court began with general propositions and legal concepts or principles. Included in this section of the charge were principles relating to "aiding and abetting." Judge Greene informed the jurors, in part, that to convict on a theory of aiding and abetting, they "must find that the defendant" (1) "knowingly associated himself with the commission of the crime"; (2) "participated in the crime as something he wished to bring about"; (3) "intended, by his actions, to make the crime succeed"; and (4) engaged in "some affirmative conduct . . . in planning or carrying out [the] crime." The judge also declared, "It is not necessary that you find a defendant charged as an aider and abett[o]r was actually present while the crime was committed." After completing his instructions regarding general propositions and legal principles, Judge Greene began the charge as to each count of the indictment.

When he reached count 10 of the indictment, Judge Greene first read the count

to the jury:

> Mr. Parker, Mr. Fortson, Mr. Henson and Mr. McCray . . . while armed with a firearm, and with the intent to kill another and to inflict serious bodily injury on another and with conscious disregard of an extreme risk of death or serious bodily injury to another, caused the death of Antw[a]n Buckner by engaging in a gun battle, on or about May 30, 2010, which [gun] battle caused injuries from which Antw[a]n Buckner died on or about June 3, 2010.

After setting forth the elements of second-degree murder while armed, and

other matters, the court explained that, in this case, the government was not required

"to prove that a defendant personally fired the fatal round," and that if the

government proved the following elements, "[t]hen, as a matter of law, . . . that

defendant is deemed to have caused the death of Mr. Buckner":

> [F]irst that the defendant was armed with a firearm and prepared to engage in a gun battle[.] [S]econd, that the defendant did, in fact, engage in a gun battle on the date and at the place during the time Mr. Buckner was shot. Third, that the defendant did not act in self-defense or defenses of another . . ., at the time he participated in the gun battle. Fourth, that the defendant's conduct on the date and at the place during the time Mr. Buckner was shot was a substantial factor in the death of Mr. Buckner. Fifth, that at the time of the defendant's conduct, he intended to kill or seriously injure another person or acted

in conscious disregard of an extreme risk of death or serious bodily injury to another person.   And sixth, that it was reasonably foreseeable the death or serious bodily injury to innocent bystanders could occur as a result of the defendant's conduct on the date and at the place during the time Mr. Buckner was shot.

The court also stated, in part, "any person who in some way intentionally participates in the commission of a crime, can be found guilty, either as an aider and abett[o]r or as a principal offender."   After reminding the jurors that he had already instructed them on the elements of second-degree murder, Judge Greene again turned to aiding and abetting, reiterating some principles, before saying:

[W]ith regard to the charges against Mr. Parker, Mr. Fortson, Mr. Henson, and [Mr.] McCray under this count, you're instructed that one of the theories under which each of them is charged is aiding and abetting, as I have explained that to you, and you should consider their guilt or innocence of the charge under this count in accordance with the princip[les] of aiding and abetting.

During a break in the instructions, Judge Greene expressed concern to the prosecutor and defense counsel about the urban gun battle and aiding and abetting instructions and asked the prosecutor, "Is your theory that when you prosecute under the urban gun battle theory, that somebody can be found guilty as a principal under the urban gun battle theory, or an aider and abett[o]r under that theory, or is aiding

and abetting separate from and a different theory from urban gun battle?" The court also stated, "the way the instruction is given to the jury, it imparts to the jury that the jury can look at this urban gun battle prosecution, and they can convict the defendant as either a principal on this urban gun battle theory, or an aider and abett[o]r on this urban gun battle theory. And we never discussed that, nobody ever raised the issue." The prosecutor responded, "I think that legally they could." In addition, the prosecutor asserted "that urban gun battle is a causation instruction." After further "back and forth" discussion, Judge Greene asked for "a scenario, based on the evidence in this case, under which a defendant . . . could be convicted as an aider and abett[o]r, but not under the urban gun battle theory." The prosecutor replied that if the jury "determine[s] that Mr. McCray aided and abetted in the commission of this crime by sort of getting everything started, but then they look at urban gun battle, and they look at causation, and they say . . . [m]aybe he wasn't a substantial factor in bringing about [Mr. Buckner's] death, [he] could still be guilty under aiding and abetting liability, even though [he was] not a substantial factor in bringing about the death." [15] Judge Greene ended the discussion by observing that "the

---

[15] Even though no 380 casings from Mr. McCray's gun were found around the circle, the prosecutor "guess[ed]" that "theoretically" his defense counsel could argue that Mr. McCray "went down and shot at the Avenue, but he didn't come back up and shoot at the circle." However, the prosecutor believed that "[u]nder aiding

(continued…)

[g]overnment's theory is that you can be a participant in an urban gun battle that is a second degree murder as either an aider or abettor or a principal. But I say [in the instructions] that all of these people are charged as aiders and abettors . . . but, in fact, they're all charged as principals under an urban gun battle theory." Judge Greene invited the parties to give him "a case or some authority" on the matter. On the following day, no counsel presented him with a case or other authority, and Judge Greene continued instructing the jury.[16]

### *Applicable Legal Standard and Principles*

Our review of this jury instructional issue is guided by the following legal standard and principles. "Where an objection to a jury instruction was preserved at

---

(…continued)
and abetting, the jury could still find Mr. McCray guilty, because he went down and set the whole thing off by shooting at the Avenue."

[16] After closing arguments, the trial court expressed concern to counsel that the prosecutor's rebuttal emphasized only one of the six elements of the urban gun battle theory. Therefore, Judge Greene informed the jury that he wanted "to focus on [that theory] for a moment" because of comments made by the lawyers during closing arguments. He essentially repeated his instructions, setting forth all six elements of the urban gun battle theory.

trial, we review the trial court's decision to give the instruction for abuse of discretion." *Headspeth v. United States*, 86 A.3d 559, 565 (D.C. 2014) (citing *Wheeler v. United States*, 930 A.2d 232, 238 (D.C. 2007)). "If we conclude that an instruction was improperly given, we will reverse a conviction unless we are able to say 'with fair assurance . . . that the judgment was not substantially swayed by the error.'" *Id.* (quoting *Kotteakos v. United States*, 328 U.S. 750, 765 (1946)).

An individual who intentionally participates in a gun battle among feuding individuals is guilty of the murder of a bystander if the gun battle was the proximate cause of the injuries that resulted in the victim's death.[17]  *Roy v. United States*, 871

---

[17]  The trial court instruction regarding an urban gun battle and proximate causation that the majority approved in *Roy* was as follows. "The instruction on causation, under the lesser included offense of second-degree murder" began with the first element of proximate causation:

> A person causes the death of another person if his actions are a substantial factor in bringing about the death and if death is a reasonably foreseeable consequence of his actions.  Death is reasonably foreseeable if it is something which should have been foreseen as reasonably related to the defendant's actions.

Before stating the second, third and fourth elements of proximate causation, the trial judge focused on the urban gun battle theory and charged the jury as follows:

> It is not necessary for the government to prove that

(continued…)

A.2d 498, 507 (D.C. 2005) ("increased risk to innocent bystanders . . . justifies the

_____

(...continued)

> a defendant personally fired the fatal round in this case. Rather if you are convinced beyond a reasonable doubt that:
>
> > One, the defendant was armed and prepared to engage in a gun battle;
> > Two, that the defendant did, in fact, engage in a gun battle on the 3400 block of Tenth Place, Southeast on June 12, 2000;
> > Three, that the defendant did not act in self-defense . . . at the time he participated in a gun battle;
> > Four, that the defendant's conduct on Tenth Place on June 12th, 2000 was a substantial factor in the death of [the victim]; and
> > Five, that it was reasonably foreseeable that death or serious bodily injury to innocent bystanders could occur as a result of the defendant's conduct on Tenth Place on June 12th, then, as a matter of law, the defendant is deemed to have caused the death of [the victim].

The trial judge returned to proximate cause, indicating that, "The government must prove causation beyond a reasonable doubt." The judge then added the second, third and fourth elements of the lesser included offense of second-degree murder:

> > Two, that at the time the defendant did so, he had the specific intent to kill or seriously injure the decedent, or acted in a conscious disregard of an extreme risk of death or serious bodily injury to the decedent;
> > Three, there were no mitigating circumstances. . . ;
> > Four, . . . he did not act in self-defense [.] . . .

*Roy*, *supra*, 871 A.2d at 506 n.8.

application of proximate cause liability to those participants who willfully choose to engage in [urban gun] battles").

A constructive amendment of the indictment can occur if, and only if, the prosecution relies at the trial on a complex of facts distinctly different from that which the grand jury set forth in the indictment." *Id*. at *98 (internal quotation marks and citation omitted). "In a variance, the proof at trial does not show such a distinctly different complex of facts, nor does the proof differ from the essential elements of the offense charged in the indictment." *Id*. at *98-99 (internal quotation marks and citation omitted). "A variance is prejudicial if it either deprives the defendant of an adequate opportunity to prepare a defense . . . or exposes him to the risk of another prosecution." *Id*. at *99 (internal quotation marks and citation omitted).

### *Discussion*

We first address Mr. McCray's, Fortson's, and Parker's argument that the trial court's instructions constituted an improper constructive amendment. From the outset of the case, the government's clear emphasis was on the urban gun battle at

Benning Terrace between the Avenue and the circle, and the proximate cause theory to support its second-degree murder charge relating to Mr. Buckner. In closing argument, one of the prosecutors told the jury "that these guys engaged in a gun battle and it doesn't matter who fired that fatal shot"; that "the law [says] . . . that all participants can be held responsible if their actions are a substantial factor in the death of the person"; and the fact that "there's no evidence that any of [the] four guns shot the fatal bullet that hit [Mr.] Buckner" does not matter, as long as the men had the requisite intent and "act[ed] in conscious disregard of an extreme risk of death or serious bodily injury." During the government's rebuttal, the other prosecutor stressed the proximate cause theory of the urban gun battle, telling the jury that "[e]very one of these men is a substantial factor in bringing about Mr. Buckner's death"; and that "the law recognizes that when you have two groups of men who turn that parking circle into a war zone and . . . an innocent bystander [] gets hit, everybody is held responsible." [18] Neither prosecutor mentioned aiding and abetting during closing and rebuttal arguments.

---

[18] Because of his concern that, in rebuttal, the prosecutor mentioned only the fourth element ("the "substantial factor" element) of the urban gun battle theory, Judge Greene reiterated all six elements of the theory.

Thus, the government's evidence and arguments at trial reflected and were consistent with the charge in count 10 of the indictment – that the defendants "while armed with a firearm, and with the intent to kill another and to inflict serious bodily injury on another and with a conscious disregard of an extreme risk of death or serious bodily injury to another, caused the death of Antwan Buckner by engaging in a gun battle, on or about May 30, 2010, which gun battle caused injuries from which Antwan Buckner died on or about June 3, 2010." Since "the prosecution [did not rely] at the trial on a complex of facts distinctly different from that which the grand jury set forth in the indictment," *Peay v. United States*, 924 A.2d 1023, 1027 (D.C. 2007) (internal quotation marks and citation omitted), there was no constructive amendment of the indictment.

Second, we cannot agree that Mr. McCray's, Fortson's, and Parker's convictions as to count 10 should be reversed because the judge gave the jury second-degree and voluntary manslaughter instructions together with the urban gun battle and aiding and abetting instructions. The record reflects some confusion as to whether the aiding and abetting instruction should have been given in this case. Nevertheless, where (a) the indictment charged defendants McCray, Fortson, Parker, and Henson as co-principals in a murder resulting from an urban gun battle,

and (b) the prosecution did not argue, as an alternative, that defendants could be guilty of aiding and abetting the murder of Mr. Buckner, we conclude that even assuming the defendants objected to and preserved their aiding and abetting claim as to second-degree murder and voluntary manslaughter, and even assuming, without deciding, that the trial court erred by giving the aiding and abetting instruction in this case, the alleged error would be harmless. *Kotteakos v. United States*, 328 U.S. 750, 765 (1946). The record does not reflect any prejudice to the defendants because: (1) as previously indicated, the prosecution did not make an aiding and abetting argument to the jury; (2) as we hold below, the government's evidence was sufficient to convict Mr. McCray, Mr. Fortson, and Mr. Parker of voluntary manslaughter as co-principals beyond a reasonable doubt; and (3) the record reflects that the jury carefully and thoughtfully considered the charges and evidence against each of the defendants before rendering guilty verdicts on count 10 against Mr. Parker, Mr. Fortson, and Mr. McCray, and a not guilty verdict as to Mr. Henson.

**Sufficiency of the Evidence**

*Appellants' Arguments*

Mr. McCray asserts that the evidence was insufficient to convict him of AWIKWA (Count 8) and the related PFCV count (Count 9).  With respect to count 10, he contends that "there is no evidence of the details of [his] firing during the gunfight resulting in the Buckner homicide," and that this conviction "should not stand as a result of the [jury instructional] issue."[19]  Mr. Henson challenges his CPWL conviction on sufficiency grounds, and Mr. Fortson contends that the evidence was insufficient with respect to his lesser-included ADW conviction (Count 5) and the related PFCV and CPWL convictions (Counts 6 and 7).

*Applicable Standard of Review*

"When analyzing the sufficiency of the evidence, we view the evidence in the light most favorable to the government, giving full play to the right of the jury to

---

[19]  Mr. Fortson also maintains that his count 10 conviction should be reversed because of the jury instructional issue.

determine credibility, weigh the evidence, and draw justifiable inferences of fact, and making no distinction between direct and circumstantial evidence." *Medley v. United States*, 104 A.3d 115, 127 n.16 (D.C. 2014) (citing *Curry v. United States*, 520 A.2d 255, 263 (D.C. 1987)) (internal quotation marks omitted). A "motion for judgment of acquittal must be granted if the evidence, when viewed in the light most favorable to the government, is such that a reasonable juror *must* have a reasonable doubt as to the existence of any of the essential elements of the crime." *Curry*, *supra*, 520 A.2d at 263 (emphasis in original) (citation omitted). "[I]t is only where the government has produced no evidence from which a reasonable mind might fairly infer guilt beyond a reasonable doubt that the court can reverse a conviction." *Medley*, *supra*, 104 A.3d at 127 n.16 (internal quotation marks and citation omitted).

### *Mr. McCray's Arguments Pertaining to Counts 8 and 9*

Mr. McCray argues that "[t]here is a dearth of evidence regarding [c]ounts 8 and 9." Count 8 of the indictment charged that Mr. McCray, Hebron, and Mungo "while armed with a firearm, assaulted persons whose identities are unknown to the Grand Jury with the intent to kill"; and count 9 charged that each of the three men possessed "a firearm" while committing the assault. Mr. McCray claims that the

government failed to prove specific intent with respect to count 8 because no proof was presented as to "the distance between the shooter and the victim." He contends that "[t]he jury had no idea how far away [Mr. McCray] was from the targets or in what direction he fired or any other facts creating an AWIK inference."

### *Applicable Legal Principles*

To prove Mr. McCray committed the charged AWIKWA offense, the government had to present evidence showing beyond a reasonable doubt that he: "(1) made an assault on [unknown men]; and (2) did so with specific intent to kill; (3) while armed." *Hagans v.United States*, 96 A.3d 1, 42, n.131 (D.C. 2014) (citing *Nixon v. United States*, 730 A.2d 145, 148 (D.C. 1999)). "To prove a specific intent to kill, the government is not required to show that the accused actually wounded the victim." *Nixon*, *supra*, 730 A.2d at 148-49 (citing *Bedney v. United States*, 471 A.2d 1022, 1024 (D.C. 1984)). "[S]pecific intent may be shown through circumstantial evidence," *id*. at 149 (citation omitted), and "may be inferred from a defendant's actions," *McKnight v. United States*, 102 A.3d 284, 288 (D.C. 2014). Moreover, "[t]he presence of a motive suggests a purposeful or reasoned killing." *Hall v. United States*, 454 A.2d 314, 317 (D.C. 1982) (citations omitted).

*Discussion*

The government presented compelling evidence against Mr. McCray from which reasonable jurors could justifiably infer that during the first shootings on May 30, Mr. McCray made an assault on young men from the Avenue, with the specific intent to kill them while armed. From Mr. Clay's testimony, if believed, jurors could reasonably infer that the feud between those identifying with the circle and those with the Avenue was intense because it involved the use of guns by persons who were, as Mr. Clay put it, "trying to kill each other." Mr. Johnson heard Mr. McCray confirm that intent by saying, "he kill[ed] when he was over there [the Avenue], some bi\*\*h a\*s nig\*\*s." During a conversation with Mr. Wages, Mr. McCray admitted that he was shooting at the Avenue with Mr. Mungo on May 30; Mr. Clay made the same statement to Mr. Faison. Moreover, this court's case law does not require the government to prove specific intent by establishing the exact distance between the shooter and the unknown persons who were assaulted.

In sum, as to counts 8 and 9 charged against Mr. McCray, reasonable jurors could justifiably infer that Mr. McCray took part in the first shootings on May 30, before Mr. Buckner was killed, given (1) the relatively close proximity of apartment

buildings 610, 603 and 605 and the accessible paths between the circle and the Avenue, as shown by government exhibits; (2) the intensity of the feud between those associated with the circle and those with the Avenue; (3) Mr. McCray's statement, revealed by Mr. Johnson, about killing some "bi**h a*s nig**s" when he was over at the Avenue, and Mr. McCray's admission to Mr. Wages that he (Mr. McCray) was shooting at the Avenue on May 30; (4) testimony about Mr. McCray's possession and firing of guns; and (5) the appearance of individuals from the Avenue in the circle. Consequently, we hold that the evidence was sufficient to convict Mr. McCray of counts 8 and 9 beyond a reasonable doubt.

### *The Second Shooting on May 30 (Count 10)*

With regard to the second shooting on May 30 that was related to Mr. Buckner's murder (Count 10), neither Mr. Fortson nor Mr. Parker challenges the sufficiency of the evidence; rather, they focus on the alleged instructional error that we discussed in the prior section of this opinion. Although Mr. McCray emphasizes the alleged instructional error, he also asserts that "there is no evidence of the details of [his] firing during the gunfight resulting in the Buckner homicide," but the record does not support this assertion and we conclude that Mr. McCray's

challenge to the sufficiency of the evidence as to count 10 is unpersuasive. When Mr. Clay heard shots "coming from the Avenue," he saw Mr. McCray, Mr. Hebron and Mr. Mungo walk by the parking lot where dumpsters were located and where evidence technicians found cartridge casings. Mr. Clay also witnessed Mr. McCray standing with Mr. Mungo in the parking lot area while taking turns firing a Glock, one of the weapons with which the firearms expert identified the retrieved casings from the parking lot/dumpster area. In addition the government presented ballistics evidence collected from the area where Mr. McCray and Mr. Mungo were seen firing the Glock. In sum, we hold that the evidence was sufficient to convict Mr. Fortson, Mr. McCray, and Mr. Parker, as co-principals, of voluntary manslaughter (Count 10) and the related weapons charges pertaining to Mr. Buckner's murder.

### *Mr. Henson's CPWL Conviction (Count 16)*

Mr. Henson challenges his conviction of CPWL under count 16 of the indictment. Count 16 charged Mr. Henson with carrying a pistol without a license "on or about May 31, 2010 and in June 2010." D.C. Code § 7-2501.01 (12) (2012 Repl.) defined "pistol" as "any firearm originally designed to be fired by use of a single hand or with a barrel less than 12 inches in length." Mr. Henson emphasizes

the government's alleged lack of proof that he possessed a gun with a barrel less than 12 inches in length. He also highlights Ms. Rajah's testimony that when she saw Mr. Henson shooting a gun in June 2010, she was unable to identify the type of gun he used. In addition, Mr. Clay, who used to reside with Mr. Henson, testified that he "always" saw Mr. Henson with "handguns" between 9 and 10 inches or 9 and 11 inches in size, but he never saw Mr. Henson with a big rifle or shotgun; Mr. Clay's observations included the period in April and May 2010.

This court previously has declared that "it is not strictly necessary to prove barrel length in order to establish that a particular firearm is a pistol." *Harrison v. United States*, 76 A.3d 826, 840 (D.C. 2013). Nevertheless, the evidence presented here is very thin; in short, it is not compelling. Viewed in the light most favorable to the government, the evidence from Mr. Clay established that Mr. Henson possessed handguns whose barrels were less than 12 inches in length, and Mr. Clay had never seen him with a big rifle or shotgun. But, that testimony was insufficient to establish beyond a reasonable doubt that Mr. Henson was shooting with a pistol "in or about May 31, 2010[,] and in June 2010." Furthermore, Ms. Rajah could not identify the type of firearm Mr. Henson had when she saw him shooting in June 2010. The government argues that Ms. Rajah "was close enough to describe a rifle

or a shotgun had she seen one, but she could not, which supports the inference that the weapon used was a pistol." Rather than a justifiable inference, we think the government's argument is speculation and does not rise to the level of proof beyond a reasonable doubt. *See Rivas v. United States*, 783 A.2d 125, 134 (D.C. 2001) (en banc) ("The evidence is insufficient if, in order to convict, the jury is required to cross the bounds of permissible inference and enter the forbidden territory of conjecture and speculation.") (internal quotation marks, alteration, and citation omitted).

### *Mr. Fortson's ADW Conviction (Counts 5 and 6)*

Mr. Fortson challenges the sufficiency of the evidence with respect to his lesser-included ADW conviction related to counts 5 and 6 of the indictment, indicating that around April or May 2010, "while armed with [a] firearm[], [he] assaulted persons whose identities are unknown to the Grand Jury with intent to kill." Mr. Brown, a maintenance employee of the District's Housing Authority was on duty when he saw Mr. Thomas and Mr. Fortson. Mr. Thomas started shooting at young men who were walking up G Street in the Benning Terrace complex. Mr. Fortson had a small handgun and he went behind a building on the right side of 46th

Place. Mr. Brown took cover and heard "a whole lot of shooting . . . back and forth." After the shooting and during words uttered in Mr. Brown's presence, Mr. Fortson declared, "[my] bad" or "[my] bag." Reasonable jurors could reasonably and justifiably infer that Mr. Brown heard shots coming from the gun in Mr. Fortson's hands, and that Mr. Fortson's words, "[my] bad" or "[my] bag" constituted an apology and a consciousness of his guilt for putting Mr. Brown in danger. In short, the government's proof was sufficient to sustain the ADW conviction and the related PFCV conviction beyond a reasonable doubt. *See Gathy v. United States*, 754 A.2d 912, 919 (D.C. 2000) ("The elements of ADW are: (1) an attempt, with force or violence, to injure another person . . .; (2) the apparent present ability to injure the victim; (3) a general intent to commit the act or acts which constitute the assault, and (4) the use of a dangerous weapon in committing the assault.") (citation omitted).

**Investigation of Mr. Faison's Alleged Mental Disabilities**

Mr. Parker argues that the trial court "deprived [him] of the opportunity to fully challenge [Mr.] Faison's credibility before the jury," and he further asserts that "the trial court … erred when it refused to allow defense counsel to investigate and

challenge the mental disabilities of key government witness Faison." Mr. McCray complains that "the failure to permit cross or get a physician's opinion [about Mr. Faison's mental state] was reversible error." We first detail the factual context for this issue.

### *Factual Context*

Opening statements in this case began on May 7, 2012; at that time, Mr. Faison was a co-defendant. On June 12, Mr. Faison entered a guilty plea and agreed to testify against his former co-defendants. The parties discussed his plea agreement and its impact on June 11 and 12, 2012. Mr. Faison testified on June 18 and 19. Defense counsel sought access to Mr. Faison's juvenile records to determine his medical history, and a Superior Court judge signed an order granting access to the records. Among the records found by counsel for Mr. Henson was a thirteen-page psychiatric evaluation, dated May 26, 2006, showing a diagnosis of bipolar disorder. Counsel for Mr. Parker asked for an expert to evaluate Mr. Faison and to determine the impact of mental illness on Mr. Faison's credibility. Counsel indicated that he could not say "it will impact credibility, or . . . it will generate useful material for impeachment purposes or indeed for cross-examination," but that

his "client is entitled to explore that possibility." The prosecutor recognized that the report mentioned "severe impairment of prefrontal function," but she argued that Mr. Faison's abnormalities were known because the report listed them as "impaired visual tracking, abnormal muscle tone, difficulty performing simple motor movements that require coordination, a snout reflex, and a trace suck reflex." Both the prosecutor and the court acknowledged that they did not know what some of the terms meant.

The court and counsel reviewed applicable case law. In the course of the discussion, the court admonished one of the prosecutors for putting a person with "serious questions regarding his credibility, in terms of his history[,] . . . on the stand in the last minute in the trial" when "the defense has no chance to investigate him." The court described Mr. Faison's testimony as "powerful," said he would be "astounded" if jurors believed it, but that "his testimony, if believed by the jury[,] is compelling." The prosecutor insisted that Mr. Faison's mental history was known – bipolar disorder, ADHD, and addiction to cannabis. Furthermore, the prosecutor argued that defense counsel had not made "a proffer to show why they're entitled to even obtaining an expert, or going . . . beyond what they have in this [2006] report." Counsel for Mr. Henson attempted to clarify the request for an expert made by Mr.

Parker's counsel saying, "only an expert would know what the terms mean about the prefontal [function] and the neurological problems, deficiencies that [the doctor who wrote the report] noted," and "what [impact] the neurological damage has on credibility, ability to tell the truth."

Ultimately the court concluded that there was no reason to delay the trial based on a six-year old report and the absence of "some seriously relevant information . . . that even arguably affects [Mr. Faison's] ability to recall or perceive or develop." In the event that "some seriously relevant information" was uncovered, the court indicated that defense counsel could file "a motion for a new trial, based on newly discovered evidence, [or] a new trial in the interest of justice." When the trial court indicated that "there's nothing here [that is, in the psychiatric report] that reflects on [Mr. Faison's] credibility," Mr. Parker's counsel responded, "these visual tracking issues . . . could be reflective of some organic defect." The court noted counsel's use of the word "could." Counsel for Mr. Parker "agree[d] [that] bipolar shouldn't go to credibility," but he contended that "it's not just the bipolar disorder," that "there could be something . . . [t]hat could be developed," and that defense counsel had "a good-faith basis . . . to have an expert . . . to see if there is

a basis to go forward."[20]   After counsel for Mr. McCray and Mr. Fortson also argued the need for time to examine the situation further, the court summarized its views, concluding that if it had "any reason to believe that there was even a slim likelihood . . . that this record was going to develop in the direction of suggesting grounds to have a mental examination of Mr. Faison, because he had mental issues that affected his ability to recall, or his ability to perceive," the court "would move in a different direction."   And, "if this record suddenly disclose[d] something," the court would have to make a decision.[21]   The court observed that the jury had been in court "for almost two months" and there was no "meritorious basis" for delay.

### *Applicable Legal Standard and Principles*

The applicable legal standard and principles pertaining to this issue are as follows.   "[A] trial judge is entrusted with broad discretion to determine the substance, form, and quantum of evidence which is to be presented to a jury." *Johnson v. United States*, 452 A.2d 959, 960 (D.C. 1982) (citations omitted).   Thus,

---

[20]   Counsel cited Mr. Faison's alleged present jail conduct stating that Mr. Faison "testified that he threw feces and urine on a guard."

[21]   Counsel for Mr. Parker maintained that, "No one is contesting that Mr. Faison lacks competency, but he lacks credibility."

"[w]e review the trial court's rulings placing limitations on cross-examination for an abuse of discretion." *Bennett v. United States*, 876 A.2d 623, 632 (D.C. 2005) (citation omitted).

"The Confrontation Clause of the Sixth Amendment protects the right of the accused in a criminal trial to confront and cross-examine the witnesses against him." *Velasquez v. United States*, 801 A.2d 72, 78 (D.C. 2002) (citing *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986)) (other citation omitted). "Cross-examination is an important means of testing the credibility of government witnesses by exposing any biases or reasons for the witness not telling the truth." *Id.* at 79 (citations omitted). "The Confrontation Clause is violated, however, only when the trial court precludes a meaningful degree of cross-examination to establish bias." *Grayton v. United States*, 745 A.2d 274, 279 (D.C. 2000) (internal quotation marks and citations omitted).

Evidence of mental illness may be relevant to a witness's competency and credibility. *Velasquez*, *supra*, 801 A.2d at 79 (citations omitted). "Although competency and credibility are related, the former concerns certain basic, prerequisite capabilities necessary to give testimony, whereas the latter is largely a

concern of the factfinders — to decide whom and what to believe." *Vereen v. United States*, 587 A.2d 456, 458 (D.C. 1991) (per curiam). With respect to competency, the trial court "must evaluate the ability to accurately perceive, recall, and relate purported facts, as well as testify truthfully." *Id*. at 457 (citation omitted).

### *Discussion*

Here, a 2006 psychiatric evaluation, found in Mr. Faison's juvenile medical records, revealed that he had been diagnosed with bipolar disorder. Bipolar disorder may be related to credibility, and an expert's evaluation may show the connection between that disorder and credibility. *See United States v. George*, 532 F.3d 933, 937 (D.C. Cir. 2008) ("We do not foreclose the possibility that testimony by an expert, which the trial judge suggested, could have shown evidence of Ms. George's [bipolar] condition to be relevant to her credibility and sufficiently distinct from evidence of drug use and violence that the Confrontation Clause might require its admission."). However, it was incumbent on Mr. Parker and Mr. McCray to indicate "how [they] would have used evidence of this illness to impeach [Mr.

Faison's] testimony or why it would have cast doubt on [his] ability or willingness to tell the truth." *United States v. Baxter*, 761 F.3d 17, 24 (D.C. Cir. 2014).

In *George*, *supra*, the district court had "suggested the possibility of an expert to explain why [a witness'] bipolar disorder would be relevant. *Id*. at 938. Significantly, Mr. Parker and Mr. McCray requested an expert in the trial court after they obtained the 2006 psychiatric report about Mr. Faison; Mr. Parker's counsel argued that he was "entitled to explore [the] possibility" that Mr. Faison's mental illness would impact his credibility. Mr. Parker and Mr. McCray contend on appeal that they needed an expert to examine Mr. Faison's medical records (a) to point out any linkage between Mr. Faison's bipolar disorder and his credibility, or (b) to determine whether anything else in his medical records reflected conditions that affect credibility. In the trial court and in order to counter the trial court's emphasis on the fact that the diagnosis of bipolar disorder occurred in 2006, six years prior to trial, Mr. Parker's counsel purported to offer a good faith basis for engaging an expert. Counsel reported a recent episode in the D.C. Jail where Mr. Faison threw feces and urine at a guard. However, without the assistance of an expert, Counsel for Mr. Parker could not say whether that incident was a manifestation of Mr. Faison's bipolar disorder that could impact his credibility.

We recognize that this court has said that, "[o]ne's psychiatric history is an area of great personal privacy which can only be invaded in cross-examination when required in the interest of justice." *Velasquez*, *supra*, 801 A.2d at 79 (citation omitted). We concluded in *Velasquez* that "there was no evidence offered that the mental condition or symptoms that [the witness] experienced in [an earlier psychotic delusional episode] persisted at the time of the trial." We specifically noted that the trial court had stated, "There is no expert opinion offered to support the defense theory that a psychotic delusional episode [was] relevant" to the credibility of claims made by the witness. *Id.* at 78. We further said that the trial court's ruling that "the evidence of the witness' mental condition three years after the offense would be of minimal, if any, relevance to her credibility," did not constitute an abuse of discretion. *Id.* at 78, 80.

The situation in this case is different from that in *Velasquez*, however, because Mr. Parker and Mr. McCray requested an expert to evaluate whether there is medical support for their theory that Mr. Faison's bipolar disorder impacted his credibility. Noteworthy also is the fact that although the trial court found that Mr. Faison had the ability "to recall" and "to perceive," the court raised questions about Mr. Faison's credibility, admonishing the prosecution for presenting a witness with "serious

questions regarding his credibility, in terms of his history[,] . . . on the stand in the last minute in the trial" when "the defense has no chance to investigate him."

We understand the trial judge's reluctance to take a break in the middle of a difficult trial to permit defendants to engage an expert to evaluate Mr. Faison's mental disabilities, and to advise the defense as to the impact of any mental disability on Mr. Faison's credibility. Nevertheless, in light of defendant's right to present a defense, and given the seriousness of the bipolar disorder and the proffer about Mr. Faison's recent episode of throwing urine and feces at a prison guard, we believe Mr. Parker and Mr. McCray were at least entitled to an opportunity to show what an expert might contribute in an effort to determine any impact of Mr. Faison's mental disabilities on his credibility. Consequently, we remand Mr. Parker's and Mr. McCray's cases to the trial court solely to provide these appellants with an opportunity to show, at a hearing and through expert opinion, whether at the time of his trial testimony, Mr. Faison's mental disabilities seriously impacted his credibility. If the results of the hearing show that Mr. Faison's mental disabilities seriously impacted his credibility at the time of trial, then the trial court should determine whether it can say with fair assurance that Mr. Faison's testimony did not sway the outcome of the verdicts against Mr. Parker and Mr. McCray. Depending

on its answer to the inquiry, the trial court should either affirm all of Mr. Parker's

and Mr. McCray's convictions, or vacate the convictions and order a new trial.

### The Remaining Issues[22]

---

[22]   We do not discuss the *Brady v. Maryland*, 373 U.S. 83 (1963) issue raised in Mr. Fortson's brief because during the appellate argument, counsel for both Mr. Fortson and Mr. Parker indicated that that issue is still pending in the Superior Court; they asked that this court allow the trial court to address the *Brady* issue in the first instance.

Mr. McCray and Mr. Parker contend that the trial court abused its discretion by not holding a pre-trial hearing on the alleged conspiracy charge.   We disagree. In *Jones v. United States*, 99 A.3d 679 (D.C. 2014), we rejected an identical contention based on *Butler v. United States*, 481 A.2d 431 (D.C. 1984), a decision which we have consistently followed.   We said:

> We also note that while appellant complains of the trial court's ruling declining to hold a pre-trial hearing on the admissibility of co-conspirator hearsay statements, this court has specifically instructed that the trial court "should make the admissibility determination *during the prosecution's evidence*[,]" "to avoid[] the impracticality of [a] mini-trial[.]"   *Butler*, 481 A.2d at 441 (italics added).

*Jones*, *supra*, 99 A.3d at 684 n.6.   Here, the trial court followed *Butler*, and hence, we discern no abuse of discretion.   In addition, after the government had presented some but not all of its evidence, the trial judge commented that he was "satisfied at this point in this trial that there is ample evidence of a conspiracy that involves all six of [the codefendants]," but that he was "not satisfied yet that the government has . . . presented clear and convincing evidence that the objectives of that conspiracy were to murder and to assault."   He gave defense counsel an opportunity to comment, but

(continued…)

### *Mr. McCray's Videotaped Confession*

Mr. McCray argues that "the totality of the circumstances require a suppression of [his videotaped] statement." He emphasizes his youth (age seventeen) at the time his videotaped confession occurred and maintains that his "confession . . . should have been suppressed as involuntary."

### *Factual Context*

We first set forth the factual context, and the trial court's findings and conclusions about the videotaped confession of Mr. McCray. Deputy United States Marshal Linwood Battle and another marshal arrested Mr. McCray on March 16, 2011, at 612 46th Place, S.E. After knocking for thirty seconds and receiving no answer, the marshals forced entry and searched for Mr. McCray. When they pulled the pillows off of a couch to make sure Mr. McCray was not hiding there, they found a handgun and secured it. MPD Officer Joseph Crespo was stationed outside of the apartment complex, below the second floor apartment where the marshals were

---

(…continued)
counsel for Mr. Parker declined "because that gives the government a road map to cure."

looking for Mr. McCray. He saw a window open up, and Mr. McCray tried to get out of the window until he saw the officer. He was apprehended by the marshals. Later, Officer Dwayne Mitchell was assigned to collect evidence at the apartment. He retrieved the gun from the couch, and identified it as a .38 caliber or "380 auto" handgun.

Before trial, Mr. McCray filed a motion to suppress statements. The motion indicated that he was arrested on March 16, 2011, at age seventeen, and that he initially declined to answer questions without a lawyer but later waived his rights. He emphasized that the detectives interviewing him yelled at him; mentioned the eviction of his family; talked about his little sister and younger brother; berated him for not being honest; stated that he would never see his child again; attempted to convince him that "it is eating him alive" (presumably because of his guilty involvement in second-degree murder); there was an inordinate delay in the questioning; the detectives used deceptive tactics and "psychological torture" on a juvenile; and therefore, his "alleged confession . . . [was not] 'the product of an essentially free and unconstrained choice by its maker'" (citing case law). He ended his motion by "request[ing] that the [c]ourt conduct an independent analysis

to determine whether [his] age played a role in the voluntariness of statements allegedly elicited from him by experienced law enforcement officer[s]."

The trial court held a hearing on April 19, 2012, on Mr. McCray's motion. Deputy United States Marshal Linwood Battle, a team leader in Mr. McCray's arrest, testified as well as Detective Lee Littlejohn, one of the detectives who interviewed Mr. McCray. The trial court made findings of fact and conclusions on April 23, 2012. After indicating that he had again reviewed the videotape (parts of it several times) and reviewed case law, Judge Greene summarized his observations about the videotape in detail and articulated the "facts [that] emerge[d]"[23]; he also

---

[23] Among the facts found by Judge Greene were the following. The "attitude" of the female detective (Detective Weeks) at the outset "was quiet and polite. She did not threaten [Mr. McCray] either physically or verbally." Mr. McCray never "ask[ed] her to stop speaking or to stop the interview." When Detective Weeks said, "You want me to lock up your baby sister" and "This is a homicide. I want to get your story," Mr. McCray "raised his voice" and "Detective Weeks then raised her voice, but it appeared she did so to be heard by the defendant and not in any threatening way." Detective Weeks told Mr. McCray that his actions would "cause [his] family to get evicted and not have a roof over their heads," and followed that statement with the question, "did you put the gun up under that cushion" (referring to the gun found in Mr. McCray's home). He replied, "No, I did not put the gun in the couch under there." Detective Weeks also asserted that everyone in the room where the gun was found would be locked up, including Mr. McCray's "mama, sister, brother in connection with the gun." Detective Weeks' questioning shifted to the shooting in the circle. After about "20 to 25 minutes into the interview," Detective Weeks expressed frustration that she could not get Mr.

(continued…)

reached conclusions drawn from the facts. The judge found that Mr. McCray arrived in the interrogation room at about 8:00 a.m., and was left alone for about two hours but was able to move around. During Mr. McCray's time in the room, "[t]he police repeatedly asked [Mr. McCray] if he wanted to use the restroom or wanted something to drink," and while Mr. McCray's "leg was shackled to a chain to the floor, he was able to sit and stand and to move around . . . and to knock on the door of the room if he needed to get someone's attention." The questioning of Mr. McCray "began about 4 and a half hours after his arrest." Detective Weeks and Littlejohn entered the room before 10:30 a.m. and Detective Weeks posed basic questions about Mr. McCray's history (e.g., date of birth, schooling, mother's name and cell phone number). "He was initially advised of his rights and invoked his right not to speak at about 10:30 [a.m.]" and about one hour later waived his rights. The questioning lasted until approximately 1:40 [p.m.] when [a third and] last detective

---

(…continued)

McCray to tell the truth and indicated she was leaving. After further discussion, including Detective Weeks' reference to cameras in the circle and another statement that she was leaving, Mr. McCray stated, "Okay. I was over there," . . . "I shot at him" (stated three times). He asserted that he "just saw people in the court and shot at them," and he admitted that "I was out there" when the decedent (Mr. Buckner) was killed. Detective Littlejohn also questioned Mr. McCray.

[to interview Mr. McCray] left the interview room."[24]   While "any time in excess of three hours is presumptively prejudicial," said Judge Greene, "[i]t does not appear . . . that there is any evidence that the police intentionally delayed their interview of the defendant."   Judge Greene determined that most of the questioning was done by Detective Weeks when she was alone with Mr. McCray and she "was not in any way physically imposing or intimidating to the defendant," and "[a]t no time was [Mr. McCray] . . . threatened either verbally or physically."

After reviewing the giving and waiver of *Miranda* rights, Judge Greene concluded that Mr. McCray "fully understood his rights and that he knowingly waived them" after initially invoking his rights.   With respect to the question of "trickery," Judge Greene stated that the detectives' statements to Mr. McCray "were not always entirely truthful and may have stretched the truth," but "much of what they told him that could be viewed as most compelling in his decision to talk was that he already had been indicted by the grand jury.   And, in fact, he had been indicted the day before his arrest."   Moreover, Judge Greene found that Mr. McCray "[n]ever appeared intimidated or affected in any way by Detective Weeks

_____

[24]   After the last detective left the room at 1:40 p.m., Mr. McCray was left alone from then until about 4:40 or 4:45 p.m. when the videotape ended.

raising her voice in response to similar conduct by the defendant." The judge was troubled by the references to Mr. McCray's family, their eviction, and their being locked up because of the gun recovered at the time Mr. McCray was arrested. However, the judge found that these statements didn't have any coercive effect on Mr. McCray because the incriminating statements were not made immediately but only after Mr. McCray asked Detective Weeks to stay.

In response to Mr. McCray's repeated references to his age and juvenile status, Judge Greene found that Mr. McCray "is somebody who had some experience with the criminal justice system before this incident," and the judge declared, "Observing him in that interview . . . I don't see how anyone could conclude that his will was ever overborne. He was thinking a whole lot about what was going on and what he would do about it. He was very calculated in how he responded." Furthermore, "[w]hile [Mr. McCray] was 17, he was certainly a mature 17 for purposes of the criminal justice system"; "he did not have any obvious disabilities"; "[t]here were no police promises of leniency in exchange for the statement," and no "badgering of the defendant." As a result of these findings, Judge Greene denied the motion to suppress statements, concluding, finally, that

"there are no separate indicia here . . . that would prompt the [c]ourt [to] exclude those statements on voluntariness grounds."

Detective Kenniss Weeks, the lead detective who conducted virtually all of the questioning of Mr. McCray, testified at trial and described the timelines of the day on which Mr. McCray was arrested and brought in for questioning. She stated that Mr. McCray had been in the interview room approximately two hours before the interview with him began. After routine booking and personal information questions were posed, Mr. McCray invoked his rights around 10:29 a.m., and Detective Weeks left the interview room. Around 11:24 a.m., Detective Littlejohn informed Detective Weeks that Mr. McCray wanted to talk. Mr. McCray waived his rights. After Mr. McCray waived his rights, Detective Weeks asked him about the gun that was retrieved from a couch in the apartment where Mr. McCray had slept the night before his arrest. Mr. McCray denied that the gun was his. Mr. McCray admitted that he was involved in the first shooting on May 30, 2010, but he did not admit any involvement in the second shooting on May 30 that resulted in Mr. Buckner's death. On cross-examination, Detective Weeks acknowledged that she had falsely informed Mr. McCray that she had surveillance camera footage that depicted Mr. McCray in the circle at the time of the May 30 shooting. During

Detective Weeks' testimony, the trial court took judicial notice, and informed the jury, "that at the time the detective was interviewing Mr. McCray, he did not have a lawyer and no lawyer had yet been assigned to him for this case."

At the insistence of Mr. McCray's attorney, the trial court instructed the jury regarding the videotaped confession immediately after the conclusion of Detective Weeks' testimony. The judge properly instructed the jury that they could consider all of the conversations between the police and Mr. McCray, whether the police warned him of his rights, where and when the statement was made, how long it took, who was present, whether the police recorded some or all of the conversations with Mr. McCray, and "the age, education and experience, intelligence and the physical and mental condition of [Mr. McCray]."

### *Applicable Legal Standard and Principles*

"Whether [Mr. McCray's] statements were voluntary is a question of law subject to de novo review on appeal, with the appropriate deference to the trial court's factual determinations." *Little v. United States*, 125 A.3d 1119, 1126-27 (D.C. 2015) (internal quotation marks and citation omitted). The government must

"prove by a preponderance of the evidence that a defendant's statements were given voluntarily." *Id*. (citation omitted). "The test for determining voluntariness of specific statements is whether, under the totality of the circumstances, the will of the [suspect] was overborne in such a way as to render his confession the product of coercion." *Id*. (internal quotation marks and citations omitted). "In deciding whether a suspect's will was overborne, the court evaluates the nature of the interrogation – including its duration and intensity, the use of physical punishment, threats[,] or trickery, and whether the suspect was advised of his rights – as well as the characteristics of the accused – including his age, education, prior experience with the law, and physical and mental condition." *Id*. (internal quotation marks and citation omitted). "[A]n involuntary statement is inadmissible at trial for any purpose." *Id*. (citation omitted).

### *Discussion*

Here, based on our review of the record, including Mr. McCray's motion to suppress the statement, the trial testimony of Detective Weeks, and the trial court's factual findings after the pre-trial hearing regarding the videotaped confession, we conclude that Mr. McCray's videotaped statement was voluntary. Judge Greene

carefully reviewed the videotape in detail; examined the totality of the circumstances, including the giving of *Miranda* warnings; considered assertions by Detective Weeks concerning eviction of Mr. McCray's family and the mention of Mr. McCray's sister and brother; and assessed factors for determining involuntariness. The court's findings clearly refute Mr. McCray's argument that the videotaped interview began at 2:30 p.m., continued until 8:23 p.m., and "[a]t that point, [Mr. McCray] ha[d] been in solitary confinement for over 14 hours." Moreover, Judge Greene's findings – that Mr. McCray, although seventeen years old at the time, was "a mature 17 for purposes of the criminal justice system," and that his responses were "very calculated" – rebut Mr. McCray's attempt to characterize his age as a "special circumstance." Furthermore, immediately after Detective Weeks' testimony, and again during final instructions, Judge Greene charged the jury about the factors they should use in weighing the videotaped evidence.

It is clear that Judge Greene was troubled by Detective Weeks' verbal threats that Mr. McCray's family could be evicted and not have a roof over their heads. This verbal threat was a tactic designed to persuade Mr. McCray to admit that the gun found in the couch on which he slept the night before his arrest belonged to him.

However, when Detective Weeks posed the question, "[D]id you put the gun up under that cushion," Mr. McCray replied, "No, I did not put the gun in the couch under there." Significantly, even after Detective Weeks told Mr. McCray that his "mama, sister, [and] brother" would be locked up because they were in the room where the gun was found, Mr. McCray continued to deny, and never admitted, that the gun was his. Hence, Detective Weeks' tactic failed to elicit a confession that the gun belonged to Mr. McCray. Mr. McCray later admitted that he participated in one of the shootings, but the threat of harm to his family had nothing to do with that admission – the family was threated only by their presence in the room where the gun was found, and Mr. McCray could alleviate the threat only by admitting that the gun was his, not by admitting to the shooting.[25]

In light of the above discussion, we hold that the government proved by a preponderance of the evidence that the statements in Mr. McCray's videotaped confession were voluntary. *Little*, *supra*, 125 A.3d at 1126; *Dorsey v. United States*, 60 A.3d 1171, 1205 (D.C. 2013) (en banc) (citing *In re S.G.*, 581 A.2d 771,

---

[25] Mr. McCray does not argue on appeal that Detective Weeks used a coercive tactic by threatening his family in order to persuade him to confess that the gun belonged to him.

775 (D.C. 1990)) ("[A]s a reviewing court, we may not usurp the prerogative of the [trial] judge, as the trier of fact, to determine credibility and weigh the evidence.").

### *Mr. McCray's Severance Motion*

Mr. McCray complains that the trial court abused its discretion by failing to grant his motion for a severance so that he could be tried with Mr. Hebron and Mr. Mungo, the only other defendants charged with AWIKWA in Counts 8 and 9 of the indictment.[26] He claims that the evidence of conspiracy was "very weak and should never have gone to the jury," and that the evidence against the other defendants with whom he was tried "was much stronger" than that against him.

---

[26] Here, nine defendants were charged in the indictment. The government wanted to try all nine defendants together, but because the courtroom could not accommodate a trial of nine defendants at the same time, in December 2011 the government informed the court of its decision to separate three of the defendants for a separate trial. Subsequently, Mr. McCray and others filed motions to sever; the trial court denied Mr. McCray's motion in March 2012, without prejudice.

***Applicable Legal Principles***

Joinder is proper where defendants are charged with conspiracy. *Ray v. United States*, 472 A.2d 854, 858 n.7 (D.C. 1984); *Davis v. United States*, 367 A.2d 1254, 1260, n.10 (D.C. 1976). "Given the vital role played by joint trials of defendants indicted together and properly joined, the trial court's denial of a severance may be disturbed only upon a clear showing that it has abused its considerable discretion." *Jenkins v. United States*, 113 A.3d 535, 541 (D.C. 2015) (internal quotation marks and citations omitted). A defendant "bears the burden of demonstrating that, as to him, joinder was 'manifestly prejudicial.'" *Castillo-Campos v. United States*, 987 A.2d 476, 492 (D.C. 2010) (citation omitted). A defendant does not suffer manifest prejudice "merely because a significant portion of the government's evidence admitted at trial is applicable only to his codefendants." *Tann*, *supra*, 2015 D.C. App. LEXIS 533, at \*126 (citing *Johnson v. United States*, 596 A.2d 980, 987 (D.C. 1991) (internal quotation marks omitted).

*Discussion*

Contrary to Mr. McCray's argument, the charges against him did not appear less serious than those against others with whom he was tried. Like three of those with whom he was tried, Mr. McCray was charged in Counts 10, 11, and 12, relating to the alleged second-degree murder of Mr. Buckner. Moreover, Mr. McCray's argument about the alleged weakness of the government's conspiracy case is unavailing. Joinder is proper when defendants are charged with conspiracy, *Ray*, *supra*, 472 A.2d at 858 n.7; the joinder decision does not take into consideration the strength of the government's evidence that has not yet been presented. In addition, on this record, Mr. McCray has not sustained his burden of showing that as a result of joinder he suffered "manifest prejudice." The charges against Mr. McCray were not less serious than those against the other men with whom he was tried. Similar to those with whom he was tried, he was acquitted on the conspiracy to murder charge, and the jury did not reach a decision on the conspiracy to assault charge. Moreover, there was compelling evidence against Mr. McCray. In short, we

discern no abuse of discretion with respect to the trial court's denial of Mr. McCray's motion to sever.[27]

---

[27] Mr. Parker presents two other arguments which we treat summarily. He contends that his convictions should be reversed "because of the admission of the highly prejudicial testimony from Ms. [] Rajah . . . that she moved from her apartment in the Benning[] Terrace area after the shooting in this case because she was afraid of Mr. Parker and two other persons." We are not persuaded by this argument. The record shows that in cross-examining Ms. Rajah, counsel for Mr. Parker tried to show her bias by bringing out the fact that the United States Attorney's Office had helped her to relocate and that she had not paid any rent during the last year. Counsel also established during cross-examination that Ms. Rajah was afraid of "Wheetie" because she had seen him "shoot people," and that she also was afraid of Mr. Magruder. On redirect examination Ms. Rajah stated that she left Benning Terrace because she was "scared" of "[t]hem coming after me." During voir dire out of the presence of the jury Ms. Rajah explained that she was also afraid of Mr. Parker because he put a gun in her home. The trial court ruled that defense counsel had opened the door, and Ms. Rajah testified before the jury that she left Benning Terrace because she was scared of Wheetie, Mr. Magruder and Parker. Neither Mr. Parker's counsel nor the prosecutor mentioned Ms. Rajah's fear during closing arguments. Under our standard of review and the circumstances which not only prompted Ms. Rajah to relocate but also to mention Mr. Parker's name, we conclude that the trial court did not abuse its discretion in permitting Ms. Rajah to specify that Mr. Parker was one of three men of whom she was afraid. *See Hairston v. United States*, 497 A.2d 1097, 1103 (D.C. 1985) ("The scope of redirect examination rests within the sound discretion of the trial court and will not be reversed absent a showing of clear abuse.").

We reject Mr. Parker's argument that his UPF, PFCV, and CPWL convictions merge because these offenses were committed "at the same time on May 30, 2010." *See Blockburger v. United States*, 284 U.S. 299 (1932) (one offense does not merge with the other if one has an element that the other does not); *see also Hanna v. United States*, 666 A.2d 845, 857 (D.C. 1995); and *Ray v. United States*, 620 A.2d 860, 863-65 (D.C. 1993).

## CONCLUSION

In sum, we (1) discern no abuse of discretion with respect to Judge Greene's approach to and resolution of the alleged juror misconduct issue; (2) conclude that (a) the trial court's urban gun battle and aiding and abetting instructions did not result in a constructive amendment of the indictment, and (b) there was no prejudice to the defendants resulting from these instructions, and hence, any error would be harmless; (3) hold that the evidence was sufficient to convict Mr. McCray of counts 8 and 9; (4) hold that the evidence was sufficient to convict Mr. Fortson, Mr. McCray, and Mr. Parker, as co-principals, of the lesser-included offense of voluntary manslaughter (count 10), as well as the related weapons charges; (5) reverse Mr. Henson's CPWL conviction on insufficiency of evidence grounds; (6) conclude that the government's evidence was sufficient to convict Mr. Fortson of the lesser-included offense of ADW; (7) hold that the government proved by a preponderance of the evidence that the statements in Mr. McCray's videotaped confession were voluntary; (8) conclude that the trial court did not abuse its discretion in denying Mr. McCray's severance motion; (9) reject Mr. Parker's contention that the trial court abused its discretion in permitting Ms. Rajah to testify on redirect that she relocated, in part, because of her fear of Mr. Parker, and we also

reject Mr. Parker's merger arguments; (10) remand Mr. Parker's and Mr. McCray's cases to the trial court solely to provide them with an opportunity to show, at a hearing and through expert opinion, whether at the time of his trial testimony Mr. Faison's mental disabilities seriously impacted his credibility; and (11) conclude that appellants' other contentions are not persuasive.

Accordingly, we affirm Mr. Fortson's lesser-included ADW conviction (counts 5 and 6) and his lesser-included voluntary manslaughter conviction (count 10), as well as the related weapons charges, and we reverse Mr. Henson's CPWL conviction (count 16).  In addition, we remand Mr. Parker's and Mr. McCray's cases to the trial court solely to provide these appellants with an opportunity to show at a hearing and through expert opinion whether at the time of his trial testimony, Mr. Faison's mental disabilities seriously impacted his credibility.  After the hearing, the trial court should enter an order consistent with this opinion's discussion of the mental disabilities issue.

*So ordered.*