*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

Nos. 17-CO-755, 17-CO-870, & 17-CO-1024

TIMOTHY PARKER, MARCELLUS MCCRAY, AND ANTONIO FORTSON, APPELLANTS,

v.

UNITED STATES, APPELLEE.

Appeals from the Superior Court
of the District of Columbia
(CF2-12342-10, CF1-4749-11, CF1-4729-11)

(Hon. Henry F. Greene, Trial Judge)

(Argued January 13, 2021[*]                                  Decided July 22, 2021)

*Peter H. Meyers* for appellant Parker.

*David H. Reiter* for appellant McCray.

*William R. Cowden* for appellant Fortson.

---

[*] This court originally heard argument in these appeals on October 23, 2018, when the division consisted of Chief Judge Blackburne-Rigsby, Associate Judge Glickman, and Senior Judge Pryor. After that argument, (1) Judge Pryor recused himself and Judge Ruiz was appointed to replace him on the division; and (2) appellants supplemented their appeals to add arguments based on the subsequent rehearing petitions, briefing, and decision in *Fleming v. United States*, 224 A.3d 213 (D.C. 2020) (en banc). In light of the change in the composition of the division and the expansion of appellants' claims, this court called for reargument in these appeals, which was held on January 13, 2021.

*David P. Saybolt*, Assistant United States Attorney, with whom *Jesse K. Liu*, United States Attorney, *Michael R. Sherwin*, Acting United States Attorney, and *Elizabeth Trosman*, *Suzanne Grealy Curt*, *Laura Bach*, and *Silvia Gonzalez Roman*, Assistant United States Attorneys, were on the briefs, for appellee.

Before BLACKBURNE-RIGSBY, *Chief Judge*, GLICKMAN, *Associate Judge*, and RUIZ, *Senior Judge*.

GLICKMAN, *Associate Judge*:  After a trial in 2012, a jury convicted appellants Timothy Parker, Marcellus McCray, and Antonio Fortson of voluntary manslaughter while armed and other felony offenses.[1]  In their direct appeals, this court rejected most of appellants' claims of error and remanded their cases to the trial court for further proceedings and rulings on two issues.  These concerned (1) whether the government suppressed favorable evidence in violation of its obligations under *Brady v. Maryland*,[2] and (2) whether the trial court precluded appellants from establishing that a government witness suffered from a mental disability that seriously diminished his credibility.  The present appeals are from the trial court's rulings against appellants on each of those issues on remand.  In addition, for the

---

[1]  *See McCray v. United States* ("*McCray I*"), 133 A.3d 205 (D.C. 2016).  The indictments charged appellants with participating in a series of "shootings, assaults, and murders that occurred in the Benning Terrace Housing complex in the Southeast quadrant of the District of Columbia from 2009 to 2011." *Id.* at 210.  The jury found appellants guilty of voluntary manslaughter while armed as a lesser-included offense of the charge of second-degree murder while armed.

[2]  373 U.S. 83 (1963).

first time in these appeals, appellants contend that their manslaughter convictions must be vacated because the trial court gave the jury the "urban gun battle" instruction that this court subsequently held erroneous in *Fleming v. United States*.[3]

We conclude that appellants' *Fleming* challenge to their convictions is not properly before us at this time, because appellants have not shown exceptional circumstances excusing their failure to raise that challenge in their direct appeals. Accordingly, appellants first must bring their *Fleming* claims in Superior Court via a collateral challenge to their convictions pursuant to D.C. Code § 23-110. We affirm the trial court's rulings on remand regarding the other issues.

## I.

In *Fleming*, this court sitting en banc considered a challenge to the causation instruction regarding a defendant's potential liability for a homicide committed in an "urban gun battle." The instruction informed the jury that:

> [A] defendant should be deemed to have caused [the victim's] death if (1) the defendant was armed and prepared to engage in a gun battle; (2) the defendant in fact engaged in a gun battle; *(3) the defendant's conduct was a substantial factor in the death of [the victim]*; (4) it was

---

[3] 224 A.3d 213 (D.C. 2020) (en banc).

reasonably foreseeable that death or serious bodily injury could occur as a result of the defendant's conduct during the gun battle; and (5) the defendant did not act in self-defense.[4]

This court had explicitly approved this causation instruction in *Roy v. United States*.[5]

But sitting en banc in *Fleming*, we overruled *Roy* and held this instruction inadequate because it did not convey to the jury that a defendant normally "cannot be held to have personally caused a death unless an action by the defendant is a but-for cause of the death, i.e., unless it is true that in the absence of the defendant's action the death would not have occurred."[6] Requiring the defendant's conduct merely to have

---

[4] *Id.* at 219 (emphasis added).

[5] 871 A.2d 498, 506–08 & n.8 (D.C. 2005). In doing so, the *Roy* court explained that

> In this jurisdiction we have held findings of homicide liability permissible where: (1) a defendant's actions contribute substantially to or are a substantial factor in a fatal injury; and (2) the death is a reasonable foreseeable consequence of the defendant's actions. We have defined substantial cause as that conduct which a reasonable person would regard as having produced the fatal effect. Thus, we hold defendants criminally accountable for, "all harms that are reasonably foreseeable consequences of his or her actions."

*Id.* at 507–08 (citations and footnote omitted).

[6] *Id.* at 217 (citing *Burrage v. United States*, 571 U.S. 204 (2014)).

been "a substantial factor" in the victim's death "is not remotely equivalent," we said, to the requirement of but-for causation.[7]

The jury at appellants' trial received the causation instruction subsequently held defective in *Fleming*. Appellants now argue that the instructional error requires that their manslaughter convictions be vacated. In opposition, the government argues that this claim of error at trial is not properly before us, because appellants did not present it on direct appeal of their convictions in *McCray I* and cannot demonstrate exceptional circumstances excusing that failure.[8] We agree with the government.

"It is a general principle of appellate practice that 'where an argument could have been raised on an initial appeal, it is inappropriate to consider the argument on a second appeal following remand.'"[9] Failure to make the argument in the initial

---

[7] *Id.* at 223.

[8] Appellants base their *Fleming* instructional challenge to their convictions on the record of the trial, not on anything in the proceedings on remand. They do not claim that the instructional error at their trial somehow infected the proceedings on remand from which the instant appeals were taken. Appellants did not challenge the urban gun battle instruction in the proceedings on remand, and the trial court had no occasion to rule or rely on it.

[9] *Thoubboron v. Ford Motor Co.*, 809 A.2d 1204, 1215 (D.C. 2002) (citing *Hartman v. Duffey*, 88 F.3d 1232, 1236 (D.C. Cir. 1996)). This principle applies to criminal as well as to civil appeals. *See United States v. Henry*, 472 F.3d 910, 913

appeal amounts to a waiver. This "rule serves judicial economy by forcing parties to raise issues whose resolution might spare the court and parties later rounds of remands and appeals."[10] An appellate court does have discretion to "waive the waiver" and excuse a returning appellant's failure to have raised a claim in an initial appeal, but courts normally exercise this discretion "only in exceptional circumstances, where injustice might otherwise result."[11]

Appellants argue that they objected to the urban gun battle instruction in their direct appeals, and that they are renewing those objections in what is now merely a continuation of those direct appeals. Both parts of this argument are inaccurate.

In their initial appeals of their convictions, appellants did not object to the instruction on the *Fleming* ground that it misstated the causation requirement.

---

(D.C. Cir. 2007) ("It is well-settled that 'where an argument could have been raised on an initial appeal, it is inappropriate to consider that argument on a second appeal following remand.'") (quoting *Nw. Ind. Tel. Co. v. FCC*, 872 F.2d 465, 470 (D.C. Cir. 1989)); *see also, e.g., United States v. Flores*, 995 F.3d 214, 223 (D.C. Cir. 2021).

[10] *Hartman*, 88 F.3d at 1236 (citing *Crocker v. Piedmont Aviation, Inc.,* 49 F.3d 735, 740 (D.C. Cir. 1995)).

[11] *Henry*, 472 F.3d at 913 (cleaned up; quoting *Crocker*, 49 F.3d at 739 and *Eli Lilly & Co. v. Home Ins. Co.*, 794 F.2d 710, 717 (D.C. Cir. 1986)); *see also Flores*, 995 F.3d at 226.

Rather, appellants mainly argued that it was error to give the urban gun battle instruction in combination with an instruction on aiding and abetting, and that the instructions "constituted an improper constructive amendment" of the indictment.[12] *McCray I* rejected those entirely different contentions. And while Mr. Fortson complained in his brief on direct appeal that the urban gun battle instruction allowed the jury to convict him without finding he had fired the fatal shot, that was a complaint about the main effect and purpose of the instruction, not an argument for its invalidity. This objection too was substantively different from an argument that the instruction improperly dispensed with the requirement of but-for causation in favor of a substantial factor test. In fact, *Fleming* confirms that a defendant who did not fire the fatal bullet may be convicted as a but-for cause of the victim's death if his actions instigated the shooting, by another, that led to the victim's death.[13]

---

[12] *McCray I*, 133 A.3d at 226.

[13] *See Fleming*, 224 A.3d at 217 ("[A] defendant cannot be held to have personally caused a death unless an action by the defendant is a but-for cause of the death[.]"); *id.* at 226 ("To illustrate the point concretely, we hold that a defendant can be viewed as having personally caused death if (1) the defendant, acting with an intent to kill, shoots at another person or takes other actions such as bringing an armed group in search of another person or brandishing a gun at another person[;] (2) the defendant's acts foreseeably cause the intended target or another person to fire shots in response; and (3) the latter shots fatally wound a victim.").

Appellants also are mistaken in arguing that *McCray I*'s remand to the trial court did not end their direct appeals, and that their current appeals from the trial court's rulings on remand should be viewed as a continuation of their direct appeals. As this court explained in *Bell v. United States*,[14] there are two types of remand. On "a record remand, this court retains jurisdiction over the case . . . [but] the record is returned to the trial court . . . to make additional findings, to hear further testimony, or to explain a ruling. The record is then returned to this court for decision."[15] In contrast, a case remand "returns the case to the trial court for all purposes. This court retains no jurisdiction over the case and the [first] appeal is terminated."[16]

*McCray I* expressly ordered a "case" remand, not a record remand.[17] Our opinion did not direct that the record be returned to us after the proceedings on remand; it specified that, after holding a hearing, the trial court itself should "enter an order" determining the outstanding "mental disabilities issue" and whether that issue entitled appellants to a new trial.[18] It follows that we are dealing now with "a

---

[14] 676 A.2d 37 (D.C. 1996).

[15] *Id*. at 41.

[16] *Id.*

[17] 133 A.3d at 240.

[18] *Id.* Our opinion did not address the *Brady* issue because, we explained, "that issue [was] still pending in the Superior Court" and appellants had "asked that

new appeal, separate from the [direct] appeal that was terminated when the case was remanded."[19]

That *McCray I* ordered a case remand also explains why this case is not in the same posture as *Fleming* when the en banc court decided it could hear a challenge to the urban gun battle instruction that had not been presented in the initial appeal heard by a division of the court. When the en banc court considered the claim in *Fleming*, there had been no intervening case remand; the case still was on direct appeal in this court.

In sum, the present appeals are not a continuation of appellants' initial direct appeals in this court. *McCray I* terminated appellants' direct appeals. The Superior Court proceedings on remand resolved a collateral attack by appellants on their convictions. Appellants were, of course, allowed to appeal the judge's adverse rulings against them in those collateral proceedings (the rulings on their *Brady* and witness-confrontation claims, the only claims before the judge). But that did not entitle appellants to include in their appeal a separate claim (of instructional error at

---

this court allow the trial court to address the *Brady* issue in the first instance." *Id.* at 234 n.22.

[19] *Bell*, 676 A.2d at 41.

trial), which they never presented on remand and on which the remand judge never ruled. This court repeatedly has held that, in an appeal from the denial of a collateral motion to set aside a criminal conviction, we will not consider claims the movant did not present in the proceedings below.[20]

Thus, we must conclude that appellants waived their current claims of instructional error at their trial. The question is whether there are exceptional circumstances present here raising a concern that injustice might result if this court does not exercise its discretion to excuse the waiver. Courts have recognized that an intervening change in the law may constitute such an exceptional circumstance, depending on the nature and significance of the change.[21] This is a pertinent factor, because this court rendered its en banc opinion in *Fleming* in January 2020, well after it decided *McCray I* in 2016, and after the proceedings on remand from that case. While appellants *could* have urged this court to overrule *Roy* in their direct appeals (just as Mr. Fleming ultimately did), we would not say that appellants should

---

[20] *See Bradley v. United States*, 881 A.2d 640, 646 n.5 (D.C. 2005) (citing *Miller v. Avirom*, 384 F.2d 319, 321–22 (D.C. 1967); *Southall v. United States*, 716 A.2d 183, 188 (D.C. 1998) (citing *D.D. v. M.T.*, 550 A.2d 37, 48 (D.C. 1988) and *Veney v. United States*, 681 A.2d 428, 435 n.10 (D.C. 1996) (en banc)).

[21] *See Flores*, 995 F.3d at 226; *Henry* 472 F.3d at 914.

have anticipated the holding of *Fleming* and done so.[22]  Nevertheless, we conclude

that waiving appellants' waiver is unwarranted in this case, for three reasons.

First, appellants have not argued that *Fleming* created an exceptional

circumstance excusing their failure to challenge the urban gun battle instruction on

causation grounds in their direct appeals.  Indeed, despite the fact that the

government challenged appellants to show exceptional circumstances sufficient to

overcome the waiver and allow them to pursue their *Fleming* argument in these post-

remand appeals, appellants have not attempted to do so.  Instead, in response to the

government's invocation of waiver, appellants have advanced only the arguments

---

[22]  *See Fleming*, 224 A.3d at 219 ("A division of the court cannot overrule a prior decision of the court.  *M.A.P. v. Ryan*, 285 A.2d 310, 312 (D.C. 1971).  It is difficult to see why a litigant should be required to present an argument to a division of the court that the division of the court would be required to reject. . . .  The United States cites no case holding that a litigant is required to present to a division of the court the argument that a prior holding of the court should be overruled, and we are aware of no such case."). The United States argues that appellants should have anticipated *Fleming* and raised a *Fleming* challenge to the urban gun battle instruction in their direct appeals because *Fleming* "was presaged by" the Supreme Court's 2014 decision in *Burrage v. United States*, 571 U.S. 204 (2014). But although the *Fleming* court found *Burrage*'s discussion of the usual requirement of but-for causation in criminal cases to be "persuasive" with respect to the causation issues before it, *see* 224 A.3d at 221, *Burrage* did not preordain the outcome in *Fleming*.  In *Burrage*, the Supreme Court construed the phrase "results from" in the federal Controlled Substances Act; it did not have occasion to address causation under the (arguably atypical) urban gun battle theory of homicide liability and the differently worded murder statute in the District of Columbia.

we rejected above — that they did object to the urban gun battle instruction in their direct appeals, and that the present appeals are continuations of their direct appeals. As a general matter, this court will not substitute its own reasoning on a point that a party has failed to address.[23]

Second, it is difficult to see why not exercising our discretion would work an injustice in this case, as appellants have not even tried to show any likelihood that a jury instruction comporting with *Fleming* would have resulted in their acquittals of manslaughter or otherwise altered the outcome of their trial in their favor. Instead, appellants have insisted the burden is on the government to show that the instructional error was harmless beyond a reasonable doubt. This contention does not withstand scrutiny, and not only because it mistakenly presupposes these appeals to be continuations of the direct appeals rather than collateral challenges. As we discuss below, a defendant must make a showing of prejudice to raise a new claim in a collateral challenge to a conviction after a direct appeal has concluded. But the government would not have borne the burden of showing harmlessness in this case even if appellants were making a *Fleming* claim of instructional error in their direct

---

[23] *See Comford v. United States*, 947 A.2d 1181, 1188 (D.C. 2008) (Court of Appeals does not "do counsel's work, create the ossature for the argument, and put flesh on its bones.") (quoting *United States v. Zannino*, 895 F.2d 1, 17 (1st Cir. 1990) (citations omitted)).

appeals — had they done so, the claim would be subject to the strictures of plain error review on account of appellants' failure to raise it at trial. Under plain error review, the government does not have the burden to disprove prejudice. Rather, it is on appellants to show prejudice affecting their substantial rights, i.e., in cases like this, a reasonable probability of a more favorable outcome if the jury had been instructed properly.[24] As appellants have not made, or even attempted to make, such a showing, they have not shown that waiving their waiver is necessary to avoid their suffering an injustice. The error in the urban gun battle instruction given at appellants' trial might have been innocuous, and if so, there is no injustice in sustaining their convictions.

The D.C. Circuit's recent decision in *United States v. Flores* is instructive here.[25] Mr. Flores was a member of a hit squad that attacked two ICE special agents in Mexico City, killing one and seriously wounding the other.[26] After Mr. Flores entered a guilty plea to reduced charges that included accessory to murder and

---

[24] *See, e.g.*, *Perry v. United States*, 36 A.3d 799, 818 (D.C. 2011) (explaining that where a party did not object to a jury instruction at trial, "it is appellants' burden to show a 'reasonable probability' of a different outcome if the jury had been properly instructed.").

[25] 995 F.3d 214 (D.C. Cir. 2021).

[26] *Id.* at 218.

attempted murder in violation of 18 U.S.C. § 1114, the federal district court of the District of Columbia sentenced him to twelve years' imprisonment.[27] He took a direct appeal, arguing the district court had erred in calculating his Sentencing Guidelines range.[28] The D.C. Circuit agreed and remanded for resentencing.[29] On remand, the district court again imposed a twelve-year sentence, and Mr. Flores took a second appeal.[30] In it, he argued for the first time that his convictions for being an accessory to murder and attempted murder had to be vacated under the Circuit's intervening decision, in *United States v. Garcia Sota*,[31] that § 1114 does not apply extraterritorially. The government countered that Mr. Flores had forfeited this argument by failing to raise it in his initial appeal.[32]

Acknowledging the "general" rule that "an appellant who fails to raise an available issue in an initial appeal may not raise that claim in a second appeal after

---

[27] *Id.* at 219.

[28] *Id.*

[29] *Id.*; *see United States v. Flores*, 912 F.3d 613, 622 (D.C. Cir. 2019).

[30] *Flores*, 995 F.3d at 219.

[31] 948 F.3d 356 (D.C. Cir. 2020). The D.C. Circuit issued this decision after the district court resentenced Mr. Flores. *See Flores*, 995 F.3d at 226.

[32] *Flores*, 995 F.3d at 223.

remand because such claims are forfeited,"[33] the D.C. Circuit (with one judge dissenting) nonetheless granted Mr. Flores the vacatur he sought. The majority opinion perceived *Garcia Sota* to be "an intervening change in the law," making it "now plain that courts in this circuit lack the power to convict and punish [Mr.] Flores under Section 1114 for extraterritorial conduct."[34] This constituted an exceptional circumstance justifying the court's discretionary consideration of an issue that Mr. Flores could have raised in his initial appeal, the court reasoned, because "injustice might otherwise result if [Mr.] Flores continues to be punished for conduct that does not constitute a crime pursuant to the law under which he was convicted."[35]

But that is not this case. *Fleming* did not confirm that the Superior Court "lack[ed] the power to punish and convict" appellants for manslaughter, or that the evidence at their trial was insufficient as a matter of law to support their convictions. *Fleming* simply held that one of the instructions given at appellants' trial was erroneous. Without having some sense of whether and how the instructional error

---

[33] *Id.*

[34] *Id.* at 226.

[35] *Id.* (cleaned up).

might have prejudiced appellants — who were acquitted of murder but found guilty of manslaughter as a lesser-included offense after a lengthy proceeding involving over 60 witnesses and 500 exhibits[36] — we cannot say appellants have demonstrated that we should address their claim to prevent an injustice.

Third, appellants are not without a potential remedy if this court declines to address their *Fleming* claim in the present appeals from the decision of the Superior Court on remand. Appellants may pursue their *Fleming* claim in Superior Court via the established route of collateral attacks on their convictions pursuant to D.C. Code § 23-110. To be sure, if they do so, appellants may have to surmount procedural barriers by showing cause for their failure to raise the claim previously (during the pendency of their direct appeals or in the post-remand proceedings) and prejudice as a result of that failure.[37] But appellants would have faced those same procedural

---

[36] *McCray I*, 676 A.2d at 220.

[37] *See, e.g.*, D.C. Code § 23-110(e) (2012 Repl.) ("The court shall not be required to entertain a second or successive motion for similar relief on behalf of the same prisoner."); *Washington v. United States*, 834 A.2d 899, 902 (D.C. 2003) ("Where a defendant has failed to raise an available challenge to his conviction on direct appeal, he may not raise that issue on collateral attack unless he shows both cause for his failure to do so and prejudice as a result of his failure.") (citing *Head v. United States*, 489 A.2d 450, 451 (D.C. 1985)); *id.* at 906 ("[A] claim not raised in a previous collateral attack is procedurally defaulted."). We express no view as to whether appellants can succeed in showing cause and prejudice.

barriers if they had raised the *Fleming* claim in the Superior Court proceedings on remand from *McCray I*; we see no reason they should be excused from doing so now.[38] This is another reason appellants have not demonstrated the existence of an exceptional circumstance calling upon this court to address their untimely challenge in order to avoid injustice.

For the foregoing reasons, we conclude that appellants' *Fleming* challenges to their manslaughter convictions are not properly before us in these appeals, and we decline to address those challenges.

## II.

Appellants contend that the trial court erred on remand in denying their post-trial *Brady* claim without an evidentiary hearing. The claim relates to an audio

---

[38] In *Flores*, the D.C. Circuit rejected the government's argument that Mr. Flores was required to bring his claim of error as a collateral attack on his conviction in the district court by motion pursuant to 28 U.S.C. § 2255 (the federal law counterpart of D.C. Code § 23-110) rather than by his appeal from the resentencing on remand. *See* 995 F.3d at 226–27. This reflected the fact that Mr. Flores's claim was one of error infecting the resentencing proceeding itself, which involved the re-imposition of a judgment of conviction that the district court had no authority to impose under the law in effect at the time of the resentencing. With respect to their *Fleming* claim, however, appellants do not claim any error in the Superior Court proceedings on remand from *McCray I*.

recording of a 911 call made by a government witness named Shunedia Rajah.  Ms. Rajah testified at trial that she saw and heard appellant Parker shooting.  In her 911 call, however, when asked by the emergency dispatcher if she "s[aw] the person who was shooting[,]" Ms. Rajah responded that she did not.  Although the government turned the recording of Ms. Rajah's 911 call over to the defense prior to trial, as an attachment to an email to defense counsel, appellants did not make use of it to cross-examine her.  They subsequently claimed that the government violated *Brady* by failing to disclose the 911 call in time for them to appreciate its significance and make use of it at trial.

The parties addressed this claim in the proceedings below through written pleadings and oral argument.  Ruling from the bench, the court stated it "d[id] n[o]t believe [an evidentiary] hearing [was] necessary . . . in view of the representations [it had] heard from counsel."  The court held there was no *Brady* violation, and that the claim "border[ed] on the frivolous," given that the government concededly apprised appellants' trial counsel of the 911 call twenty-nine days before Ms. Rajah testified, and that counsel never sought additional time to explore the matter.

An evidentiary hearing on a *Brady* claim is not required when the defendant fails to proffer evidence that the government suppressed material, exculpatory

information in its possession.[39]  We will uphold the trial court's decision to deny a

*Brady* motion without an evidentiary hearing where "under no circumstances could

the petitioner establish facts warranting relief."[40]  Claims that consist of "(1) vague

and conclusory allegations, (2) palpably incredible claims, and (3) assertions that

would not merit relief even if true" do not warrant a hearing.[41]

Here, the trial court did not err in deciding that appellants failed to proffer

evidence sufficient to require an evidentiary hearing on their *Brady* claims.  In their

pleadings, appellants charged that the government had violated its *Brady* obligations

by waiting until the eve of trial to send the 911 recording to defense counsel in a mix

of "several additional emails."[42]  In oral argument before the trial court, however,

appellants' counsel reframed their objection.  Counsel asserted that the disclosure

was not untimely, but that it had occurred as part of a "document dump of hundreds

---

[39]  *See Bellinger v. United States*, 127 A.3d 505, 519 (D.C. 2015).

[40]  *Pettaway v. United States*, 390 A.2d 981, 983–84 (D.C. 1978) (internal citations and quotation marks omitted).

[41]  *Ramsey v. United States*, 569 A.2d 142, 147 (D.C. 1990).

[42]  Appellants also asserted that the audio of the call was difficult to understand without a transcript (which the government did not provide).  But defense counsel never complained of this problem with the call at or during trial, and the claim is inconsistent with appellants' claim that their counsel never located the tape during the course of trial.

of different materials," rendering the email containing the 911 call a "needle in the haystack" that was too difficult for the defense attorneys to find in time to use. Specifically, defense counsel stated:

> [M]y argument is not, Your Honor, that they didn't have enough time to deal with it, which is what some of the other cases have dealt with; that is, the government gives partial or limited disclosure too late for the defense to effectively use it, that is not the claim I'm making here. My claim is it's a document dump, Your Honor. It's a needle in the haystack that none of these four lawyers were able to discover that it even had been given to them."

Nothing in the record, however, supports the claim that the 911 call was a "needle" in a documentary "haystack" not provided until shortly before trial. Appellants proffered only that "several" messages arrived on the eve of trial. This hardly amounts to a document dump. The email with the 911 call was entitled "Audio File attached," it contained only one attachment (the 911 recording), and it specifically stated "[a]ttached is an audio file of a 911 call made by witness Shunedia Rajah." This indicates that the 911 call, contrary to appellants' unsupported assertion, was not buried in such a manner that appellants' counsel could not have found it in the twenty-nine days preceding Ms. Rajah's testimony. On these facts, the government did not suppress the 911 call or impair appellants' ability to make use of it at trial.

Having failed to proffer facts warranting relief, appellants also failed to indicate to the trial court, either in pleadings or during oral argument, what purpose an evidentiary hearing would serve. At the oral argument on the motion before the trial court, appellants' only reference to an evidentiary hearing was a statement by one of their counsel that the purpose of the argument was to determine "whether [they] should have a hearing on [the *Brady* claims]." Counsel did not mention an evidentiary hearing again, even when the judge gave him the opportunity to make further representations after he had concluded his remarks. The trial court had no reason to think an evidentiary hearing would serve any useful purpose.

Thus, we hold that the trial court did not err in finding that appellants failed to proffer evidence sufficient to warrant a hearing on their *Brady* claim.[43]

---

[43] The government also has disputed the materiality of the 911 call, but we need not reach that issue here.

## III.

## A.

At trial, the government presented testimony from a witness named Curtis Faison. Mr. Faison originally was a co-defendant with appellants, before he entered a guilty plea and agreed to testify for the government.[44] In reviewing Mr. Faison's juvenile medical records (to which the defense had been given access), appellants' defense counsel learned he once had been diagnosed with bipolar disorder.[45] On that basis, appellants requested that the trial court allow a defense expert to evaluate Mr. Faison "to determine the impact of mental illness on Mr. Faison's credibility."[46] The trial court refused, concluding that an outdated medical report did not provide sufficient reason to delay the then ongoing trial proceedings.[47] When appellants challenged this ruling on appeal, this court in *McCray I* reversed and remanded "solely to provide these appellants with an opportunity to show at a hearing and through expert opinion whether at the time of his trial testimony, Mr. Faison's

---

[44] *McCray I*, 133 A.3d. at 231.

[45] *Id.* at 231.

[46] *Id.*

[47] *Id.*

mental disabilities seriously impacted his credibility."[48] If the trial court found that to be so, we held, it would then need to "determine whether it can say with fair assurance that Mr. Faison's testimony did not sway the outcome of the verdicts against [appellants]."[49]

On remand, appellants and the government relied on the written reports and testimony of expert witnesses who had examined Mr. Faison, reviewed his medical records, and come to conclusions about his mental health status at the time of trial. Although this court remanded on the understanding Mr. Faison might have been suffering from a bipolar disorder that impaired his testimony, neither expert witness found that to be the case.

The government's expert, Dr. Patterson, testified that Mr. Faison was not suffering from symptoms of bipolar disorder, clinical anxiety, or depression when he testified at trial. Dr. Patterson diagnosed Mr. Faison with Antisocial Personality Disorder ("ASPD"). He testified that ASPD is not equivalent to a mental illness or disability, and he did not believe it affected Mr. Faison's credibility at trial, i.e., his ability or willingness to testify truthfully.

---

[48] *Id.* at 240.

[49] *Id.* at 234.

Appellants' expert, Dr. Gupta, agreed with Dr. Patterson that Mr. Faison's bipolar disorder was inactive at the time of trial; she opined, however, that Mr. Faison suffered from depression and anxiety that affected his trial testimony. Although she agreed with Mr. Faison's ASPD diagnosis, Dr. Gupta did not base her opinion on that diagnosis or opine that it impaired Mr. Faison's credibility.

In its oral ruling, the trial court "credited and gave great weight to the reports and testimony of Dr. Patterson," but did not credit Dr. Gupta's opinion, finding it to be "conclusory" and not supported by "persuasive analysis."  The court concluded that Mr. Faison's credibility was not seriously impaired by mental disability or mental illness.  It therefore found it unnecessary to decide whether his testimony swayed the jury's verdict.

**B.**

Where, as here, a trial judge "presided over [a] factfinding hearing and was able to observe and assess the demeanor of the witnesses," we take care to avoid "usurp[ing] the prerogative of the judge, as the trier of fact, to determine credibility and weigh the evidence." [50]  We must uphold the trial court's determination to credit

---

[50] *In re S.G.*, 581 A.2d 771, 775 (D.C. 1990).

Dr. Patterson, and the court's consequent finding that Mr. Faison's mental disabilities did not seriously affect his testimony at trial, unless those determinations are clearly erroneous or devoid of support in the evidence.[51]

## C.

This court has emphasized that "[o]ne's psychiatric history is an area of great personal privacy which can only be invaded in cross-examination when required in the interest of justice."[52]  Although expert evidence concerning a witness's mental health history may be relevant to credibility under some circumstances, its "use . . . for impeachment is greatly disfavored and is allowed only where it is shown that the evidence casts *substantial doubt* on the witness' capacity to comprehend and relate

---

[51]  *See, e.g.*, *Wilkins v. Ferguson*, 928 A.2d 655, 666 (D.C. 2007).

[52]  *Velasquez v. United* States, 801 A.2d 72, 79 (D.C. 2002).  *See also Collins v. United States*, 491 A.2d 480, 484 (D.C. 1985) (explaining that there is a presumption against ordering "psychiatric examination[s] of a witness to determine [their] competency *or aid the jury's assessment of credibility* . . . [b]ecause such an examination has the potential to impinge upon a witness' right to privacy and to harass a witness") (emphasis added) (citing *Rogers v. United States*, 419 A.2d 977, 980 (D.C. 1980));  *Hilton v. United States*, 435 A.2d 383, 387 (D.C. 1981) (noting that the trial court, in deciding whether to "order a . . . psychiatric examination for the purpose of . . . aid[ing] the jury in its assessment of a witness' credibility . . . must weigh the potential evidentiary advantage of the examination against the dangers of an unwarranted invasion of privacy[,] . . . the potential harassment resulting therefrom or the likelihood that the witness may be deterred from coming forward.") (citing *United States v. Benn*, 476 F.2d 1127 (1972)).

the truth of pertinent events."[53] Admitting such evidence when it has not been shown to have a serious impact on credibility is "manifestly unfair and unnecessarily demeaning of the witness," and risks "introduc[ing] . . . a collateral issue which would confuse the jury . . . ."[54] We have approved the exclusion of expert testimony concerning a witness's mental health that "would have been of only "marginal relevance" to the witness's credibility.[55] *McCray I* thus properly framed the issue in terms of whether appellants could show that Mr. Faison's mental disabilities "*seriously impacted* his credibility"[56] by casting substantial doubt on his "ability or willingness" to tell the truth.[57]

---

[53] *Jackson v. United States*, 940 A.2d 981, 995 (D.C. 2008). *See also Bennett v. United States*, 876 A.2d 623, 632–33 (D.C. 2005); *Bryant v. United States*, 859 A.2d 1093, 1102 (D.C. 2004) (declaring that the mere fact of testifying "did not make it open season on a witness' entire mental history."); *Roy v. United States*, 871 A.2d 498, 510 (D.C. 2005) (overturned on unrelated grounds by *Fleming*, 224 A.3d at 217).

[54] *Velasquez*, 801 A.2d at 79.

[55] *Id.* at 79–80; *Bennett*, 876 A.2d at 635 (D.C. 2005).

[56] 133 A.3d at 240 (emphasis added).

[57] *Id.* at 233 (quoting *United States v. Baxter*, 761 F.3d 17, 24 (D.C. Cir. 2014)); *see also Tyer v. United States*, 912 A.2d 1150, 1156 (D.C. 2006) (citing *United States v. Smith*, 77 F.3d 511, 516 (D.C. Cir. 1996)).

We are not persuaded that the trial court clearly erred in finding that appellants did not make that showing. Appellants have not provided any reason to conclude that the trial court erred in crediting Dr. Patterson's testimony over that of Dr. Gupta. We defer to that credibility determination.[58] And Dr. Patterson's hearing testimony plainly supported the trial court's conclusion that Mr. Faison's ASPD did not have a serious impact on his ability or willingness to testify truthfully.

We express no opinion on whether an ASPD diagnosis can *ever* have a sufficiently serious impact on a witness's credibility such that expert evidence on that witness's mental condition would be admissible at trial. Dr. Patterson conceded that possibility. We hold only that the evidence in this case supports the trial court's finding that ASPD did not have such an impact on Mr. Faison.

---

[58] *See Rock Creek Plaza-Woodner Ltd. Partnership v. District of Columbia*, 466 A.2d 857, 859 (D.C. 1983) ("In resolving factual issues presented by conflicting expert testimony, the trial court is in the best position to evaluate the experts' qualifications, demeanor, experience, reasoning, and testimony. . . . Thus, as a general proposition, when faced with conflicting expert testimony, the trial court may credit one expert over the other"). *See also In re. T.W.M.*, 18 A.3d 815, 821 (D.C. 2011) (per curiam) ("The trial court, when acting as fact-finder . . . is entitled to credit the testimony of one expert witness over that of another."); *Nest v. Totah Venture, LLC. V. Deutsch*, 31 A.3d 1211, 1222 (D.C. 2011) (same).

**IV.**

For the foregoing reasons, we affirm the judgment of the Superior Court.